# Exhibit "A"

# JONES DAY

51 LOUISIANA AVENUE, N W  •  WASHINGTON  D C  20001 2113
TELEPHONE  202-879-3939  •  FACSIMILE  202-626-1700

July 8, 2005

VIA ELECTRONIC MAIL
AND OVERNIGHT COURIER

The Honorable Louis C. Bechtle, Esq.
Special Master/Mediator
c/o Conrad O'Brien Gellman & Rohn, P.C.
1515 Market Street, 16th Floor
Philadelphia. PA 19102-1916

Re:    *In re: NorthWestern Corporation*, Chapter 11 Bankruptcy
       Case No. 03-12872 (JLP), in the United States Bankruptcy
       Court for the District of Delaware; *Houlihan, Lokey,*
       *Howard & Zukin Capital, Inc., Appellant v. NorthWestern*
       *Corp., Appellee*, Civil Action No. 05-396-JJF, in the
       United States District Court for the District of Delaware

Dear Judge Bechtle:

    We represent the appellant Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan") in the referenced appeal.[1]  On May 5, 2005, the Bankruptcy Court issued its final order in effect reducing the fees due to Houlihan as financial advisor to the Committee of Unsecured Creditors (the "Committee") by $1,137,500.00. Houlihan filed a timely appeal of this order on May 12, 2005. This letter is a brief explanation of the background of this appeal and an explanation of why Houlihan believes mediation is unnecessary here.

## Factual Background

    The Debtor in the underlying Chapter 11 bankruptcy case is NorthWestern Corporation, a Delaware corporation ("NorthWestern," the "Company," or the "Reorganized Debtor"), which filed its petition on September 14, 2003. On October 1, 2003, the United States Trustee for Region 3 ("UST") appointed the Committee. On October 17, 2003, the Committee filed its application to retain and employ Houlihan *nunc pro tunc* (the "Retention Application"). The material terms of Houlihan's retention provided that the firm would be: (i) retained under

---

[1] Although the caption of the June 29, 2005, Order Appointing Special Master/Mediator identifies Houlihan, Lokey, Howard & Zukin Capital, Inc. as the appellant, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is the appellant of record.

JONES DAY

The Honorable Louis C. Bechtle, Esq.
Conrad O'Brien Gellman & Rohn, P.C.
July 8, 2005
Page 2

Section 328(a) of the United States Bankruptcy Code (the "Bankruptcy Code"); (ii)  paid a fixed monthly fee of $175,000.00, plus reasonable out-of pocket expenses; and (iii) paid a Transaction Fee of $2.5 million dollars upon the occurrence of certain transaction, including confirmation of a plan of reorganization.  The Transaction Fee was subject to a negotiated reduction credit formula which reduced the Transaction Fee by a percentage of the monthly fixed fee on an ascending basis starting in the seventh month of Houlihan's employment.

On October 31, 2003, the UST filed a limited objection (the "Limited Objection") to the Retention Application, which was consensually resolved by counsel to the Committee and the UST.  Accordingly, counsel to the Committee subsequently filed a certification of counsel regarding the resolution of the Limited Objection (the "Certification") including a proposed form of order, which was approved by the Bankruptcy Court by order dated December 8, 2003 (the "Retention Order"), a copy of which is attached hereto as Exhibit A for your convenience.

The Retention Order explicitly states that Houlihan was retained pursuant to Section 328(a) of the Bankruptcy Code which mandates that the terms and conditions of a professional's retention can not be subsequently abrogated unless the court finds that the original terms are improvident in light of developments that could not have been anticipated at the time the retention was approved.  However, pursuant to the consensual resolution between the Committee and the UST, the Retention Order authorized Houlihan's fees to be examined pursuant to the reasonableness standard of Section 330(a), if, and only if, the UST filed an objection to a Houlihan fee application.

Throughout the next thirteen months Houlihan submitted a total of eleven fee applications on a regular basis which were approved by the Court without objection from any interested party or creditor, including the UST.

On October 19, 2004, the Bankruptcy Court entered an order confirming the Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").  The Plan became effective on  November 1, 2004.

Houlihan filed an amended final fee application on January 21, 2005.  On February 10, 2005, the Bankruptcy Court held an initial hearing on the Final Fee Application and deferred ruling at that time.  Houlihan filed a supplement to the amended final fee application on March 6, 2005 (hereinafter collectively, the "Final Fee Application").  The Bankruptcy Court held a subsequent hearing on the Final Fee Application on April 5, 2005.  Neither the fee examiner assigned to the case nor any party or creditor, including the UST, objected to Houlihan's Final Fee Application.

JONES DAY

The Honorable Louis C. Bechtle, Esq.
Conrad O'Brien Gellman & Rohn, P.C.
July 8, 2005
Page 3

On May 5, 2005, the Bankruptcy Court issued a memorandum opinion (the "Opinion") and Order (the "Fee Order") reducing Houlihan's previously approved hourly fee by 50%, while awarding Houlihan the $2,018,750.00 adjusted Transaction Fee that the Bankruptcy Court had also approved pursuant to the Retention Order. Copies of the Opinion and Fee Order are attached hereto as Composite Exhibit B. The net effect was to reduce the total monthly fees authorized to be paid to Houlihan by the Retention Order from $2,275,000.00 to $1,137,500.00. In doing so, the Bankruptcy Court found it improvident that that Houlihan and the Debtor's financial advisor, Lazard Freres & Co. LLC ("Lazard"), had allegedly performed duplicate financial advisory and analysis services which could not have been foreseen at the time Houlihan was originally retained and employed.

Houlihan filed its appeal of the Fee Order on May 12, 2005.

**Current Status**

In this appeal, Houlihan alleges two points of error by the Bankruptcy Court. Specifically, that the Bankruptcy Court (Judge Peterson presiding): (i) erred by reviewing Houlihan's terms and conditions of employment pursuant to Section 330 of the Bankruptcy Code, because the Court had previously (under Judge Case) approved the retention of Houlihan under the standards set forth in Section 328(a) of the Bankruptcy Code; and (ii) abused its discretion by concluding that supposedly unforeseeable circumstances rendered certain provisions of the Retention Order "improvident" within the meaning of Section 328(a) of the Bankruptcy Code.

Houlihan strongly believes that its appeal is well-founded based upon the plain language of the Bankruptcy Code and prevailing Third Circuit case law. Houlihan does not believe that mediation is necessary in this case for two principal reasons. First, there is no appellee. While the Debtor has been nominally designated as the appellee, the Debtor never objected to Houlihan's fees and we have been authorized to represent that the Debtor does not intend to file a reply brief in this matter. Consequently, Houlihan would effectively be mediating with itself. Second, the prevailing case law and language of the Bankruptcy Code support the conclusion that the Bankruptcy Court erred. There is, therefore, no basis for Houlihan to unilaterally withdraw or otherwise compromise its position in this appeal.

In short, there is no appellee. Hence, a necessary party to the mediation is missing and, as a practical matter, a settlement of this appeal can not be facilitated. Accordingly, we respectfully request that the mediation of this appeal be abated and we be authorized to file an initial brief forthwith.

JONES DAY

The Honorable Louis C. Bechtle, Esq.
Conrad O'Brien Gellman & Rohn, P.C.
July 8, 2005
Page 4

Your attention to and consideration of this matter is appreciated.

Sincerely,

Kevin D. Orr

Enclosures

cc:     Richard A. Chesley, Esq.
        William E. Chipman, Jr., Esq.

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |
| | : | |

## ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF HOULIHAN LOKEY HOWARD & ZUKIN FINANCIAL ADVISORS, INC. AS FINANCIAL ADVISOR FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS [Re: Docket No. 255]

UPON the application (the "Application") by the Official Committee of Unsecured Creditors of NorthWestern Corporation (the "Committee"), pursuant to Sections 328(a) and 1103 of the Bankruptcy Code[1] and Rule 2014(a) of the Bankruptcy Rules, for the entry of an order authorizing the Committee to employ and retain Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") as its financial advisors, effective as of October 1, 2003; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having reviewed the Application, the Siegert Affidavit, and the Engagement Letter,[2] and due notice of the Application having been given under the circumstances; and it appearing that no other or further notice is necessary or required; and the Court having determined that the relief requested in the Application is in the best interests of the Debtor, its estate, its creditors and other parties-in-interest; and after due deliberation and sufficient cause appearing therefore; it is hereby

---

[1]     Any capitalized term used herein but not otherwise defined shall be ascribed the meaning given to such term in the Application.

[2]     The Engagement Letter is attached hereto as Exhibit A.

**FOUND** that:

A.    Houlihan Lokey is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code;

B.    The retention and employment of Houlihan Lokey by the Committee on the terms set forth in the Engagement Letter is necessary and in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

C.    The terms of the Engagement Letter are reasonable terms of employment for purposes of Section 328(a) of the Bankruptcy Code; and

D.    The Debtor owes no amount to Houlihan Lokey for pre-petition fees and expenses; and it is therefore

**ORDERED**, that the Application is **GRANTED**; and it is further

**ORDERED**, that, pursuant to Sections 328(a) and 1103 of the Bankruptcy Code and Rule 2014(a) of the Bankruptcy Rules, the Committee is hereby authorized to employ and retain Houlihan Lokey as its financial advisors effective as of October 1, 2003, on the terms set forth in the Application and this order, and to extent consistent with the Application, this Order, and the Engagement Letter; and it is further

**ORDERED**, that Houlihan Lokey shall be compensated in accordance with the terms of the Engagement Letter, subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court; and it is further

**ORDERED,** that the indemnification provisions set forth in the Engagement Letter are approved, subject during the pendency of this Chapter 11 case to the following:

(a)    subject to the provisions of subparagraph (c), _infra,_ the Debtor is authorized to indemnify, and shall indemnify, Houlihan Lokey in accordance with the Engagement Letter for any claim arising from, related to or in connection with, the services provided for in the Engagement Letter, but not for any claim arising from, related to, or in connection with, Houlihan Lokey's post-petition performance of any other services, unless such post-petition services and indemnification therefore have been approved by the Court;

(b)    notwithstanding any provisions of the Engagement Letter to the contrary, the Debtor shall have no obligation to indemnify Houlihan Lokey or provide contribution or reimbursement to Houlihan Lokey for any claim or expense that is either (i) judicially determined (the determination having become final) to have arisen solely from Houlihan Lokey's bad faith or gross negligence, or (ii) settled prior to a judicial determination as to Houlihan Lokey's bad faith or gross negligence, but determined by the Court, after notice and a hearing pursuant to subparagraph (c), _infra,_ to be a claim or expense for which Houlihan Lokey should not receive indemnity, contribution or reimbursement under the terms of the Engagement Letter, as modified by this order;

(c)    if, before the earlier of (i) the entry of an order confirming a Chapter 11 plan in this case (that order having become a final order no longer subject to appeal), or (ii) the entry of an order closing this Chapter 11 case, Houlihan Lokey believes that it is entitled to the payment of any amounts by the Debtor on account of the Debtor's indemnification, contribution and/or reimbursement obligations under the Engagement Letter (as modified by this order),

including without limitation the advancement of defense costs, Houlihan Lokey must file an application with this Court, and the Debtor may not pay any such amounts to Houlihan Lokey before the entry of an order by this Court approving such payment. This subparagraph (c) is intended only to specify the period of time during which the Court shall have jurisdiction over any request for compensation and expenses by Houlihan Lokey for indemnification, contribution or reimbursement, not to limit the duration of the Debtor's obligation to indemnify Houlihan Lokey; and

      (d)    the limitation of liability to "the amount of fees actually received by Houlihan Lokey pursuant to this Agreement," is stricken; and it is further

**ORDERED**, that Houlihan Lokey shall file interim and final fee applications for allowance of its compensation and expenses with respect to its services with the Court in accordance with application provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any orders of the Court; provided, however, that Houlihan Lokey may submit time records in a summary format which shall set forth a description of the services rendered by each restructuring professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Committee. Therefore, the information requirements of Rule 2016 of the Bankruptcy Rules and Rule 2016-2 of the Local Rules are hereby modified and waived, to the extent necessary, with respect to Houlihan Lokey. The Debtor is authorized to pay Houlihan Lokey's monthly fees and to reimburse Houlihan Lokey for its costs and expenses as provided in the Engagement Letter, upon approval by the Court of interim and final applications. All fees and reimbursements paid or payable to Houlihan Lokey in accordance with the Engagement Letter and this order shall be subject to the Court's approval; and it is further

**ORDERED**, that, the Office of the United States Trustee reserves all rights to object to any request by Houlihan Lokey for compensation during the Trial Period (as defined in the Engagement Letter); and it is further

**ORDERED**, that, notwithstanding anything to the contrary herein or in the Engagement Letter, all of Houlihan Lokey's fees and expenses in this case, including, without limitation, the Transaction Fee, (as defined in the Engagement Letter), shall be subject to approval by this Court under the standard set forth in Section 328(a) of the Bankruptcy Code upon proper application by Houlihan Lokey in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable orders of this Court; provided, however, that the Office of the United States Trustee shall retain the right to object to Houlihan Lokey's request for the payment of a Transaction Fee pursuant to the standard set forth in Section 330(a) of the Bankruptcy Code; and it is further

**ORDERED**, that, during the pendency of this Chapter 11 case, this Court shall retain exclusive jurisdiction to construe and enforce the terms of the Application, the Engagement Letter and this Order.

Dated: Wilmington, Delaware
~~November~~ _____, 2003
Dec. 8

_____
THE HONORABLE CHARLES CASE
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A



## HOULIHAN LOKEY HOWARD & ZUKIN

### FINANCIAL ADVISORS

*www.hlhz.com*

October 17, 2003

To:    The Official Committee of Unsecured Creditors (the "Committee") of Northwestern
Corporation ("Northwestern", the "Company" or the "Debtor"), in care of:

Debtor:                                    Unsecured Creditors Committee Chair:
Northwestern Corporation                   Angelo Gordon & Company
125 S. Dakota Ave.                         245 Park Avenue, 26th Floor
Sioux Falls, SD                            New York, NY
57104-6403                                 10167-0002
Attn: William M Austin,                    Attn:  Thomas Fuller
Chief Restructuring Officer

Unsecured Creditors Committee Counsel:
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue Of The Americas, 29th Floor
New York, NY  10019-6028
Attn: Alan Kornberg, Esq.


Gentlemen:

This letter confirms the terms of the agreement between Houlihan Lokey Howard & Zukin
Financial Advisors, Inc. ("Houlihan Lokey" or the "Firm"), the Committee and the Debtor
concerning the Committee's engagement of Houlihan Lokey to provide financial advisory and
related services to the Committee in connection with the Debtor's Chapter 11 case (the "Case"),
which are pending in the United States Bankruptcy Court in Delaware (the "Bankruptcy Court").

1.    <u>Scope of Engagement</u>.  In connection with Houlihan Lokey's exclusive representation of
the Committee it will carry-out and advise the Committee on the following:

        (a)    Evaluating the assets and liabilities of the Debtor;

        (b)    Analyzing the financial and operating statements of the Debtor;

        (c)    Analyzing the business plans and forecasts of the Debtor;

Minneapolis   •   225 S. Sixth Street #4950   •   Minneapolis, Minnesota 55402   •   tel 612 338 2910   •   fax 612 338 2938
Los Angeles  New York  Chicago  San Francisco  Washington, D C   Dallas  Atlanta  London
Investment advisory services through Houlihan Lokey Howard & Zukin Financial Advisors

Official Committee of Unsecured Creditors of Northwestern Corp.
October 17, 2003

-2-

(d)    Evaluating the prospects for debtor in possession financing (if
any), cash collateral usage and adequate protection therefore and
the prospects for any exit financing in connection with any plan of
reorganization and any budgets relating thereto;

(e)    Providing such specific valuation or other financial analyses as the
Committee may require in connection with the Cases;

(f)    Assessing the financial issues and options concerning (a) the sale
of the Debtor, or any of its assets, and (b) any plan of
reorganization (collectively, the "Plan");

(g)    Analyzing and explaining the Plan to various constituencies; and

(h)    Providing testimony in Bankruptcy court, on behalf of the
Committee, if necessary.

2.    **Representation.** Neither the Committee, its constituents, nor any of their advisors or
professionals (including, but not limited to, Unsecured Creditors Committee Counsel), shall be
liable for the fees, expenses or other amounts payable to Houlihan Lokey hereunder.
Notwithstanding such arrangement, Houlihan Lokey has been retained on behalf of the
Committee, and Houlihan Lokey is not authorized to be, and will not purport to be, acting on
behalf, or at the direction, of the Debtor for any purpose, unless otherwise agreed to by the
Committee. All financial advice, written or oral, provided by Houlihan Lokey to the Committee
pursuant to this Agreement is intended solely for the use and benefit of the Committee, which
advice may not be disclosed publicly or made available to third parties without the prior consent
of Houlihan Lokey, which consent shall not be unreasonably withheld.  At the direction of
Committee Counsel, certain communications and correspondence between Houlihan Lokey and
either Committee Counsel or the Committee, and work product and analyses prepared by
Houlihan Lokey for either Committee Counsel or the Committee in connection with this matter,
will be considered in preparation for potential litigation concerning the restructuring of the
Company, and accordingly, will be subject to the attorney-client privilege and work-product
privilege between Houlihan Lokey and Committee Counsel.

3.    **Advisor.** Houlihan Lokey's services are limited to those specifically provided in this
Agreement or subsequently agreed upon in writing by the parties hereto, and Houlihan Lokey
shall have no obligation or responsibility for any other services. Houlihan Lokey is providing its
services hereunder as an independent contractor, and the parties agree that this Agreement does
not create an agency or fiduciary relationship between Houlihan Lokey and the parties to this
Agreement.

4.    **Consideration.** As consideration for the services being provided by Houlihan Lokey
hereunder, the Debtor shall pay Houlihan Lokey a fee of $175,000 per month (the "Monthly
Fee"). Payment of the first Monthly Fees shall be due immediately upon entry by the
Bankruptcy Court of an order approving the Committee's retention of Houlihan Lokey.
Thereafter, the Debtor shall pay the Monthly Fee, in advance, on or before the first day of each

Official Committee of Unsecured Creditors of Northwestern Corp.
October 17, 2003

-3-

month. The Debtor's first payment of Monthly Fees shall cover the period beginning October 1, 2003 through the last day of the Month in which the Entry of the order approving Houlihan Lokey's retention is granted. In addition, the Debtor agrees to promptly reimburse Houlihan Lokey, upon request from time to time, for all out-of-pocket expenses reasonably incurred by Houlihan Lokey in connection with the matters contemplated by this Agreement. Out-of-pocket expenses shall include, but not be limited to, all reasonable travel expenses, accommodation expenses, duplicating charges, on-line service charges, messenger services, delivery services, meeting services, long distance telephone and facsimile charges incurred by Houlihan Lokey. Payment of all fees and reimbursed out-of-pocket expenses shall be made in care of Houlihan Lokey at the address above, Attention: P. Eric Siegert.

In addition, upon the consummation of any Transaction (defined below), Houlihan Lokey shall be paid in cash an additional fee (a "Transaction Fee") equal to $2.5 million. 25% of any Monthly Fees earned and received by Houlihan Lokey for the 7th, 8th, and 9th months of the engagement, and 50% of any Monthly Fees earned and received by Houlihan Lokey for the 10th month and thereafter, will be credited against the Transaction Fee. No Monthly Fees earned by Houlihan Lokey for its pre-petition work on behalf of the Northwestern Ad Hoc bondholders committee shall be credited. If the Company consummates, or enters into an agreement in principle to engage in (and which subsequently closes at any time) a Transaction during the terms hereof or within twelve (12) months after any termination of this Agreement (the "Tail Period"), Houlihan Lokey shall be entitled to receive its Transaction Fee upon the consummation of such Transaction as if no such termination had occurred.

As used herein, the term "Transaction" includes, but is not limited to, the following:

(i)    Any merger, consolidation, reorganization, recapitalization, business combination or other transaction pursuant to which the Debtor is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (including, without limitation, existing creditors, employees, affiliates, and/or shareholders) (collectively, a "Purchaser"),

(ii)    The acquisition, directly or indirectly, by a Purchaser (or by one or more persons acting together with a Purchaser pursuant to a written agreement or otherwise) in a single transaction or a series of transactions, of (x) all or a significant part of the assets or operations of the Debtor; or (y) all or a significant part of the outstanding or newly-issued shares of any capital stock (or any securities convertible into, or options, warrants or other rights to acquire such capital stock);

(iii)    The closing of any other sale, transfer or assumption of all or substantially all of the assets, liabilities or stock of the Debtor; or

(iv)    The confirmation of a chapter 11 plan of reorganization or liquidation.

The parties acknowledge that a substantial professional commitment of time and effort will be required by Houlihan Lokey and its professionals hereunder, and that such commitment may foreclose other opportunities for Houlihan Lokey. Moreover, the actual time and commitment required for the engagement may vary substantially, creating "peak load" issues for Houlihan

Lokey.   Given the numerous issues which may arise in these cases, Houlihan Lokey's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Houlihan Lokey that will be required in this engagement, and the market rate for Houlihan Lokey's services of this nature whether in, or out of court, the parties agree that the fee arrangement hereunder is reasonable, fairly compensates Houlihan Lokey and provides certainty to the Debtor and the Committee.

5.    **Bankruptcy Court**.  Subject to the prompt receipt of documents and approvals required to be received from Houlihan Lokey (e.g., declarations), the Committee shall, within a reasonable period after the execution of this Agreement by all parties hereto, seek an order from the Bankruptcy Court authorizing the employment of Houlihan Lokey pursuant to the terms of this Agreement, as professional persons pursuant to (and subject to the standard of review of) sections 328(a) and 1103 of the Bankruptcy Code, the Bankruptcy Rules, applicable local rules and orders of the Bankruptcy Court.  The employment application and the order authorizing employment of Houlihan Lokey shall be provided to Houlihan Lokey sufficiently in advance of their filing, and must be acceptable to Houlihan Lokey in its sole discretion.  If the Order authorizing the employment of Houlihan Lokey is obtained, the Debtor shall pay all fees and expenses as promptly as possible in accordance with the terms of this Agreement, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders of the Bankruptcy Court.  This Agreement shall be binding upon the Debtor only upon approval of the Bankruptcy Court.  Except for the preceding sentence, the terms of this paragraph are solely for the benefit of Houlihan Lokey and may be waived, in whole or in part, only by Houlihan Lokey.

6.    **Termination**.  This Agreement is terminable upon thirty days written notice solely by the Committee or Houlihan Lokey, provided, however, that if this Agreement is terminated, the Debtor shall pay Houlihan Lokey all previously unpaid Monthly Fees and the Monthly Fee for the month in which the effective date of termination occurs.  Notwithstanding any termination of this Agreement, the Debtor agrees to pay Houlihan Lokey the Monthly Fee for a minimum of three months.   The termination of this Agreement will not affect (a) the Debtor's indemnification, reimbursement, contribution and other obligations set forth in this Agreement, (b) Houlihan Lokey's right to receive, and the Debtor's obligation to pay (i) any and all Monthly Fees and expenses earned as of the effective date of termination of this Agreement and (ii) the Transaction Fee payable in respect of a Transaction that is consummated during the Tail Period.

7.    **Information.**  The Debtor will promptly provide or procure the provision to Houlihan Lokey of all information concerning the Debtor's business and affairs which is relevant to Houlihan Lokey for the proper provision of the services, as set out in this Agreement, and all such further information as Houlihan Lokey may reasonably request, all of which will be, to the Debtor's best knowledge, accurate and complete in all material respects at the time it is provided.  In addition, the Debtor will promptly correct any material information so provided to Houlihan Lokey if it subsequently appears that any such information was or has become materially inaccurate or misleading in any respect   The Committee acknowledge and agree that, in rendering its services hereunder, Houlihan Lokey will be using and relying on information made available to it by the Debtor and their advisors (and information available from public sources and other sources deemed reliable by Houlihan Lokey) (the "Information") without independent verification thereof by Houlihan Lokey or independent appraisal by Houlihan Lokey.  Houlihan

Official Committee of Unsecured Creditors of Northwestern Corp.
October 17, 2003

-5-

Lokey does not assume responsibility for the accuracy or completeness of the Information or any other information regarding the Debtor.

8.    **CHOICE OF LAW; JURISDICTION.**    THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN NEW YORK, NEW YORK. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE PARTIES TO THIS AGREEMENT WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.

9.    **Severability**. If it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that any term or provision hereof is invalid or unenforceable, (i) the remaining terms and provisions hereof shall be unimpaired and shall remain in full force and effect and (ii) the invalid or unenforceable provision or term shall be replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term or provision.

10.    **Publicity.**    Upon consummation of any Transaction, Houlihan Lokey may, at its own expense, place announcements in financial and other newspapers and periodicals (such as is customary) describing its services in connection with such Transaction.

11.    **Entire Agreement**. This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understanding relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each party.

12.    **Indemnification.**    As a material part of the consideration for Houlihan Lokey to furnish its services under this Agreement, the Debtor shall indemnify Houlihan Lokey and shall hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, shareholders, employees, agents and controlling persons within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, any actions taken or omitted to be taken by an Indemnified Party in connection with Houlihan Lokey's provision of services to the Committee, or any Transaction (as defined herein) or proposed Transaction contemplated thereby. In addition, the Debtor shall reimburse the Indemnified Parties for any legal or other expenses reasonably incurred by them in respect thereof at the time such expenses are incurred; provided, however, there shall be no liability under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined (and from which there is no further right of appeal) to have resulted from the willful misconduct, gross negligence, bad faith or self-dealing of any Indemnified Party.

Official Committee of Unsecured Creditors of Northwestern Corp.
October 17, 2003

-6-

If for any reason the foregoing indemnification is unavailable to any Indemnified Party or is insufficient to hold any Indemnified Party harmless, the Debtor shall contribute to the amount paid or payable by the Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Committee and the Debtor, on the one hand, and Houlihan Lokey, on the other hand, in connection with the proposed Transaction and/or the services rendered by Houlihan Lokey. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or otherwise, then the Debtor shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Committee and the Debtor, on the one hand, and Houlihan Lokey, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Parties to any such losses, claims, damages, liabilities and expenses shall not exceed the amount of fees actually received by Houlihan Lokey pursuant to this Agreement.

The Debtor shall not effect any settlement or release from liability in connection with any matter for which an Indemnified Party would be entitled to indemnification from the Debtor unless such settlement or release contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey   The Debtor shall not be required to indemnify any Indemnified Party for any amount paid or payable by such party in the settlement or compromise of any claim or action without the prior written consent of the Debtor.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant proportion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Debtor set forth in this Agreement, the Debtor will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Debtor set forth herein, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions reasonably satisfactory to Houlihan Lokey.

The Committee and the Debtor further agree that neither Houlihan Lokey nor any other Indemnified Party shall have any liability, regardless of the legal theory advanced, to the Committee, the Debtor or any other person or entity (including the Debtor's equity holders and creditors) related to or arising out of or related to this Agreement, any actions taken or omitted to be taken by an Indemnified Party in connection with Houlihan Lokey's provision of services to the Committee, or any Transaction (as defined herein) or proposed Transaction contemplated thereby, except for any liability for losses, claims, damages, liabilities or expenses incurred by the Committee and/or the Debtor which are finally judicially determined (and from which there is no further right of appeal) to have resulted from the willful misconduct, gross negligence, bad faith or self-dealing of any Indemnified Party. The indemnity, reimbursement, contribution and other obligations and agreements of the Committee and the Debtor set forth herein shall apply to any modifications of this Agreement, shall be in addition to any liability which these parties may

Official Committee of Unsecured Creditors of Northwestern Corp.
October 17, 2003

-7-

otherwise have, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of these parties and each Indemnified Party. The foregoing indemnification provisions shall survive the consummation of any Transaction and/or any termination of the relationship established by this Agreement.

Official Committee of Unsecured Creditors of Northwestern Corp.
October 17, 2003

-8-

The obligations of Houlihan Lokey are solely corporate obligations, and no officer, director, employee, agent, shareholder or controlling person of Houlihan Lokey shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of any other party to this Agreement or any person relying on the services provided hereunder. The Debtor's obligations with respect to any and all payments owing to Houlihan Lokey and the indemnification, reimbursement, contribution and other similar obligations of the Debtor under this Agreement shall survive any termination of this Agreement.

This Agreement is effective as of October 1, 2003.

OFFICIAL UNSECURED CREDITORS COMMITTEE OF NORTHWESTERN CORPORATION, et al.

By: ANGELO GORDON & CO., solely in its capacity as Chair of the Committee and not in its individual capacity

By: _Thomas M. Fuller_____
       Thomas Fuller

HOULIHAN LOKEY HOWARD & ZUKIN FINANCIAL ADVISORS, INC.

By:_____
       P. Eric Siegert
       Managing Director

Official Committee of Unsecured Creditors of Northwestern Corp.
October 17, 2003

-8-

The obligations of Houlihan Lokey are solely corporate obligations, and no officer, director, employee, agent, shareholder or controlling person of Houlihan Lokey shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of any other party to this Agreement or any person relying on the services provided hereunder The Debtor's obligations with respect to any and all payments owing to Houlihan Lokey and the indemnification, reimbursement, contribution and other similar obligations of the Debtor under this Agreement shall survive any termination of this Agreement.

This Agreement is effective as of October 1, 2003.

OFFICIAL UNSECURED CREDITORS COMMITTEE OF NORTHWESTERN CORPORATION, et al.

By: ANGELO GORDON & CO., solely in its capacity as Chair of the Committee and not in its individual capacity

_By:_ _____
        Thomas Fuller

HOULIHAN LOKEY HOWARD & ZUKIN FINANCIAL ADVISORS, INC.

_By:_ _____
        P. Eric Siegert
Managing Director

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Reorganized Debtor. | ) | **Re: Docket No. 2632** |
| | ) | |

## MEMORANDUM OPINION WITH RESPECT TO FINAL FEE
## APPLICATION OF HOULIHAN, LOKEY, HOWARD & ZUKIN[1]

Houlihan, Lokey, Howard & Zukin ("Houlihan") was retained as Financial Adviser to the

Official Committee of Unsecured Creditors pursuant to an Engagement Letter dated October 17,

2003. The scope of the engagement, which was clearly not as extensive as the Debtor's Financial

Advisor, Lazard Frères & Co. LLC ("Lazard"), was to evaluate the assets and liabilities of the

Debtor, analyze Debtor's financial and operating statements, its business plans and forecast,

analyze DIP financing, use of cash collateral and adequate protection, provide valuation of assets,

assess issues regarding sale of the Debtor,[2] analyze the Plan of Reorganization and explain it to

various creditor constituencies, and provide testimony in court on behalf of the Committee. As

to the latter matter, the record from the confirmation hearing reflects that Houlihan, together with

Lazard, provided valuation testimony that the value of the Debtor's assets ranged between $1.4 to

$1.67 billion, which the Court found reasonable and persuasive. (Confirmation Order, p. 29)

These valuations reflected a downward adjustment of present value of QF liabilities to $140

million from over $320 million. Both advisers thus concluded that based on total claims of $2.2

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law
pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2] No sale of the Debtor ever occurred.

to $2.3 billion, the debtor had a net negative equity of at least $586 million. (*Id.* at p. 80).

Houlihan's Engagement Letter provided for a monthly fee of $175,000.00, plus reimbursement of reasonable out-of-pocket expenses. [Docket No. 255, Exhibit "B"]. In addition to this handsome monthly fee, Houlihan was to be paid a "Transaction Fee" equal to $2.5 million, with reduction credit of 25% of the monthly fee for the seventh, eighth and ninth months, and a 50% reduction credit for all months after the tenth month. A qualifying "transaction" was defined to include confirmation of a chapter 11 plan of reorganization. Paragraph 5 of the Engagement Letter, provides in pertinent part that once approved, "the Debtor shall pay all fees and expenses as promptly as possible in accordance with the terms of this agreement, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders of the Bankruptcy Court."[3]

The Retention Order authorized Houlihan's employment effective October 1, 2003. [Docket No. 503, December 8, 2003]. The Retention Order provides, in pertinent part:

> ORDERED, that, pursuant to Sections 328(a) and 1103 of the Bankruptcy Code and Rule 2014(a) of the Bankruptcy Rules, the Committee is hereby authorized to employ and retain Houlihan Lokey as its financial advisors effective as of October 1, 2003, on the terms set forth in the Application and this order, and to the extent consistent with the Application, this Order, and the Engagement Letter; and it is further

> ORDERED, that Houlihan Lokey shall be compensated in accordance with the terms of the Engagement Letter, subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court . . . .

The Retention Order concludes that during the pendency of the chapter 11 case, the Court shall retain exclusive jurisdiction to construe and enforce the terms of the Application to Employ, the

---

[3] In this case, due to thirteen months of retention, the reduction credit was $481,250.00.

2

Engagement Letter and the Retention Order.

In a supplement to Houlihan's Amended Twelfth and Final Fee Application, Houlihan requested approval of a Transaction Fee of $2,018,750.00 and approval of the flat monthly fees of $2,275,00.00, totaling $4,293,750.00, plus costs of $108,541.52 for the periods from September 30, 2003 through October 31, 2004. [Docket No. 2632]. According to Houlihan, its professionals billed a total of 4662.8 hours on this project. As calculated, the blended hourly rate for the total monthly fees was thus $487.90 per hour, the blended hourly rate for the Transaction Fee was $432.95 per hour, bringing the total hourly rate to $920.85.

Houlihan was paid the Transaction Fee in full in October 2004, before any application was filed seeking Court approval of such fee, which was in direct contravention of the Retention Order. During the February 10, 2005, hearing, the Court noted: "surprising to me, I see that Houlihan was paid a Transaction Fee of $2,018,750 before any order of the court was entered authorizing that fee." Houlihan postures the weak argument that the Engagement Letter allowed for the Transaction Fee payment without Court review or order because the Engagement Letter should be interpreted to trigger immediate payment upon occurrence of the transaction, namely, confirmation of the chapter 11 plan. That argument is improvident in and of itself because it totally ignores the well established provisions of the Bankruptcy Code demanding that the Court has an independent duty to review and pass upon professional fee applications before payment, and the Retention Order itself clearly requires such procedure.[4]

It is Houlihan's position that the test for approval of Houlihan's Final Fee Application

---

[4] Indeed, testimony from Lazard's witness revealed that the Debtor made payment to Lazard of their $5.5 million Transaction Fee before applying for Court approval, which Lazard promptly returned to the debtor.

3

must be based upon section 328(a) of the Code,[5] rather than section 330(a), because the Office of

the U.S. Trustee has filed no objection to Final Fee Application. The Retention Order provides

in this regard:

> ORDERED, that, notwithstanding anything to the contrary herein or in the
> Engagement Letter, all of Houlihan Lokey's fees and expenses in this case,
> including, without limitation, the Transaction Fee, (as defined in the Engagement
> Letter), shall be subject to approval by this Court under the standard set forth in
> Section 328(a) of the Bankruptcy Code upon proper application by Houlihan Lokey
> in accordance with the applicable provisions of the Bankruptcy Code, the
> Bankruptcy Rules, the Local Rules and any other applicable orders of this Court;
> provided however, that the Office of the United States Trustee shall retain the right
> to object to Houlihan Lokey's request for the payment of a Transaction Fee
> pursuant to the standard set forth in Sections 330(a) of the Bankruptcy Code; . . . .

In re Texas Securities, Inc., 218 F.3d 443, (5th Cir. 2000), held that barring changed

conditions, a court may not recompute a professional's compensation using a lodestar formula

where the court has already approved a hybrid contingent fee / hourly rate formula pursuant to

section 328(a). In Texas Securities, the retention order set forth the specific basis for the section

328(a) fee. The only condition allowing a court to examine the fixed fee under section 328(a) is

where, notwithstanding such fixed rate,

> the court may allow compensation different from the compensation provided
> under such terms and conditions after the conclusion of such employment, if such
> terms and conditions prove to have been improvident in light of developments not
> capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a) (emphasis added).

The Retention Order, however, did not "expressly and unambiguously state specific terms

and conditions (e.g., specific hourly rates or contingency fee arrangements) that are being

---

[5] Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code (the "Code"0, 11 U.S.C. § 101 et seq.

4

approved pursuant to the first sentence of section 328(a), . . . ." *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 261 (3d Cir. 1995). That specific provision provides for employment "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis or on a contingent fee basis." 11 U.S.C. § 328(a). The Retention Order states, somewhat ambiguously, that "all of Houlihan Lokey's fees and expenses in this case, including, without limitation, the Transaction Fee . . . shall be subject to approval by this Court under the standard set forth in Section 328(a) of the Bankruptcy Code . . . ." I conclude that this language means the Court may review the monthly fees and Transaction Fee to determine if they are "reasonable" on "an hourly basis." The "improvident" test comes into play once the reasonableness test is satisfied, which is "shall be subject to approval by the court." *See* 11 U.S.C. § 328(a).

*In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13 (Bankr. S.D. N.Y. 1991), put its finger on one of the serious problems present in this fee request when it noted:

> Finally, the application must explain how the investment banker/advisor will eliminate, or at least reduce, the duplication of effort Judge Paskey alluded to in *Hillsborough*, 125 B.R. at 838-39, where there are armies of professionals apparently doing the same thing as the investment banker/advisor. Specifically, the intention is to avoid accountants and investment bankers/advisors massaging the same numbers twice when one trip to the masseuse would generally suffice.

*Id.* at 27. Here, one only has to review the Order Confirming Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, where the Court recites the duplication of the effort of Lazard and Houlihan in his finding:

> Both Lazard Freres & Co LLC ("Lazard") and Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan") used the three standard valuation approaches . . . . Lazard determined that the Enterprise Value of the Reorganized Debtor approximated the midpoint of the range of these methodologies, $1.5 million.

5

> Using the same methodologies, Houlihan independently arrived at a range of value for the Reorganized Debtor of approximately $1.4 billion to $1.67 billion.

(Confirmation Order, pp. 28-29).

Finally, the retention agreements reflect some similarities in the two advisors' employment duties, however, Lazard's duties are clearly more expansive. Lazard duties subsume and duplicate the Houlihan retention obligations, so much so that is difficult for this Court to accept why duplication of effort on common matters should require two substantial transaction fees - one for $5.5 million (Lazard) and another for $2,018,750 (Houlihan), especially in light of the fact that monthly compensation totaling $4,875,000.00 was paid to the two advisors based on 7,875 hours worked over a short period of only thirteen months.

Accordingly, based on all of the circumstances in this case, and particularly the duplication of work by the financial advisers, and considering the total blended hourly rate of each adviser, Lazard at $1711.58 and Houlihan at $920.85,[6] I determine, in light of the monthly compensation paid to each firm, that the Transaction Fees must be reduced to a reasonable level.

Houlihan's Memorandum in support of the Transaction Fee cites *In re UDC Homes*, 203 B.R. 218 (Bankr. D. Del. 1996), as being an all fours with Houlihan's Final Fee Application. In, *UDC Homes*, Houlihan was retained as financial adviser to the Preferred Shareholders at a flat fee of $75,000 per month. *Id.* at 220. The *UDC Homes* Court analyzed the services performed and applied an hourly rate analysis based on information supplied by Houlihan, who conceded that it sometimes billed on an hourly basis to non-bankruptcy clients. *Id.* at 224. Ironically, the

---

[6] At hearing, Houlihan's blended hourly rate was explained to be lower because Houlihan had to come up to speed on the case, while Lazard had conducted a substantial amount of work for the Debtor pre-petition.

hourly rate would have been as much as $3,300 per hour during one month when activity was minimal. The *UDC Homes* Court found the application deficient in terms of comparative data for similar charges outside bankruptcy, and therefore reduced Houlihan's monthly fees from $332,499 to $230,000, thereby applying the traditional Lodestar method (number of hours times a reasonable hourly rate) to the "final" monthly retainer. Thus, the *UDC Homes* Court applied section 330(a) analysis to the monthly fee.

Moreover, the case authorities are fairly uniform in holding that financial advisors are subject to the requirements of Federal Rule of Bankruptcy Procedure 2016(a), especially with respect to fixed monthly fee arrangements. *See, e.g., In re Hillsborough Holdings Corp*, 125 B.R. 837, 840-41 (Bankr. M.D. Fla. 1991). The *Hillsborough* Court cited *In re Gillett Holdings, Inc.*, 137 B.R. 475 (Bankr. D. Colo. 1992), *In re Mortgage & Realty Trust* 123 B.R. 626 (Bankr. C.D. Cal. 1991), and *In re Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987). The *Mortgage & Realty Trust* Court opined the adviser can always decide not to undertake bankruptcy work, but if it does take such work, it must comply with the legal requirements of the Code and Bankruptcy Rules. The *Mortgage & Realty Trust* Court then refused to approve a monthly retainer payment to the debtor's financial advisor, acknowledging such retainer may be permissible under section 328, but it would nevertheless still be subject to evidentiary justification before and after the services were rendered, thereby applying Bankruptcy Rule 2016(a).[7]

---

[7] Rule 2016(a) provides, in pertinent part:
   An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.

As to the duplication of services by the two financial advisors retained in this case, I must assume from the testimony of Messrs. Yearly and Greer that the financial advisors performed services in accordance with their respective retention agreements. A comparison of the proposed services detailed in the agreements and evidently rendered by the advisors are compared as follows.

Lazard:

(a)  A review and analysis of the Company's business, operations and financial projections;

(b)  Evaluating the Company's potential debt capacity in light of its projected cash flows;

(c)  Assisting in the determination of a capital structure for the Company;

(d)  Assisting in the determination of a range of values for the Company on a going concern basis;

(e)  Advising the Company on tactics and strategies for negotiating, and participating in meetings and negotiation, with its creditors, regulators and other parties in interest (the "Stakeholders");

(f)  Advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to the Restructuring;

(g)  Advising and assisting the Company in evaluating potential capital markets transactions of public or

Houlihan:

(a)  Evaluating the assets and liabilities of the Debtor;

(b)  Analyzing the financial and operating statements of the Debtor;

(c)  Analyzing the business plans and forecasts of the Debtor;

(d)  Evaluating the prospects for debtor in possession financing (if any), cash collateral usage and adequate protection therefore and the prospects for any exit financing in connection with any plan of reorganization and any budgets relating thereto;

(e)  Providing such specific valuation or other financial analyses as the Committee may require in connection with the Cases;

(f)  Assessing the financial issues and options concerning (a) the sale of the Debtor, or any of its assets, and (b) any plan of reorganization (collectively, the "Plan");

(g)  Analyzing and explaining the Plan to various constituencies; and

8

private debt or equity offerings (a "Financing") by the Company, and, on behalf of the Company, evaluating and contacting potential sources of capital and assisting the Company in negotiating such a Financing;

(h)  Assisting the Company in preparing documentation within our area of expertise that is required in connection with Restructuring;

(i)  Assisting the Company in identifying and evaluating candidates for a potential Sale Transaction, advising the Company in connection with negotiations and aiding in the consummation of a Sale Transaction 1;

(j)  Attending meetings of the Company's Board of Directors and its committees;

(k)  Providing testimony, as necessary, with respect to matters which have been engaged to advise you on in any proceeding before the Bankruptcy Court; and

(l)  Providing the Company with other general restructuring advice.

(h)  Providing testimony in Bankruptcy court, on behalf of the Committee, if necessary.

---

1 As used in this letter, the term "Sale Transaction" means any transaction or series of transactions involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company; (b) the acquisition, directly or indirectly, by

9

a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding stock of the Company or possessing a majority of the then outstanding voting power of the Company (except as may occur with current Stakeholders as a result of a Restructuring); (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of significant assets, securities or other interests of the Company or (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of a significant interest in the Company to a third party.  Sale Transactions shall exclude any sale of only the Expanets and Blue Dot assets.

According to Lazard's testimony and Final Fee Application, Lazard raised the DIP financing, negotiated a rate reduction of 1.75% on $390 million of credit (saving $6.8 to $7 million per year), developed the business plan, developed valuation, analyses and debt capacity reports, assisted in preparation of the disclosure statement, negotiated a favorable settlement with the Montana Public Service Commission, calling for a 8.5% rate of return on rate base and a rate freeze through September 2006, developed a consensual plan of reorganization, gave expert testimony at the confirmation hearing, provided valuation analysis on the stock issue, assisted in evaluating NYSE and NASDAQ listing requirements, responded to interested prospective purchases of assets, assisted in development of information forwarded to creditors, assisted and advised Debtor in connection with meetings with credit rating agencies, and gave advice on

proposed exit financing of $125 million. Lazard states: "By all accounts the Debtor's restructuring was an overwhelming success and Lazard played a critical role in this success." The Lazard Memorandum Opinion and Order allowing fees addresses the short-falls of the reorganization, which clearly dismisses the above laudatory statement.

Houlihan, on the other hand, summarizes its agreed services as follows:

(a)   Strategic Discussions, Planning & Review;

(b)   Financial and Operational Due Diligence;

(c)   Valuation and Corporate Finance Work;

(d)   Financial Analysis and Monitoring;

(e)   Correspondence, Meetings and Discussions with Parties-in-interest; and

(f)   Case Administration.

Its activities were admittedly directed toward the Official Committee of Unsecured Creditors rather than the overall project of the Debtor's reorganization.

In *UDC Homes*, the advisors provided the court with a list of thirty-two domestic transactions having a value between $200 and $500 million dollars, where the advisor was paid a percentage of the transaction value,[8] ranging from .5% to 1.5% and averaged at .9%. 203 B.R. at 222-23. The advisors also provided the court with a list of thirty-one restructurings involving values from $102 million to $2.5 billion, where the average transaction fee was 1.09% of the transaction's accreted security value. *Id.* The *UDC Homes* Court concluded that the .72%

---

[8] *UDC Homes* involved a stock purchase agreement. 203 B.R. at 222-23. The comparative data at issue in *UDC Homes* analyzed domestic transactions during the period between January 1, 1992 through November 28, 1995, and restructuring fees during the during the period of March 1990 through the second quarter of 1995. *Id.*

11

sought by the advisors, based on the two benchmarks, satisfied the test of reasonableness within the standards set forth in *Busy Beaver*. *Id.* at 223. *UDC Homes* is not a comparable case to the present situation.

Lazard submitted in evidence Exhibit 1, a two- part exhibit entitled "Debtor Advisor Restructuring Fees" ('A') and acquisition listings ('B').[9] Neither Exhibit 'A' nor 'B' satisfy the express provisions of section 330(a)(3)(E), which requires the Court to consider: "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practioners in cases other than cases under this title." 11 U.S.C. § 330(a)(3)(E). Clearly Exhibit 'A' fails that test because, as admitted by Mr. Yearly, the restructuring success fees provided in the Exhibit was a percentage of total funded debt based primarily upon cases in chapter 11 bankruptcy, including NorthWestern, and not restructures "in cases other than cases made this title." As to Exhibit 'B,' such exhibit is a resume of cases involving sale transactions and fees based on a percentage of the sale price, which is irrelevant because no sale occurred in this chapter 11 case. Consequently, Exhibit 1 does not present credible evidence of the percentage fee concept to establish the validity of the reasonableness of the requested transaction fees, both as to Lazard and Houlihan.

## CONCLUSION

Based on the foregoing, I accept and find the blended hourly rate of $900.00 as representative of the market. However, I cannot overlook the excessive duplication of effort between Houlihan and Lazard. For that reason, I find improvident this duplication of services,

---

[9] A copy of Exhibit 1 is attached to the Fee Auditor's Final Report regarding Lazard's Final Fee Application [Docket No. 2570] as Response Exhibit A and B.

12

which occurred after the retention order was entered, and thus could not have been foreseen by the Court at the time Houlihan's application was approved under section 328(a). Therefore, the total request of $4,293,750.00 will be reduced to $3,156,250.00. This reduced amount represents a 50% reduction of the flat monthly fee of $2,275,000.000, thereby reducing that rate to $1,137,500.00, coupled with the Transaction fee of $2,018,750.00. I award Houlihan a final fee of $3,156,250.00, plus reasonable out-of-pocket expenses of $93,109.40.

A separate order shall enter.

Dated: May 5, 2005

_____
Honorable John L. Peterson
United States Bankruptcy Judge

13