# UNREPORTED OPINION CITED IN INITIAL BRIEF OF APPELLANT

Westlaw.

Not Reported in B.R.                                                                                    Page 1
Not Reported in B.R., 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

H

Not Reported in B.R., 1998 WL 887256
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.
In re: TEMTECHCO, INC. f/k/a Tempo Technology
Corporation a/f/k/a Suprahards Manufacturing Corporation
and Suprahards USA Sales Corporation Debtor(s)
Official Committee of Unsecured Creditors on its own
behalf and on behalf and on behalf of Temtechco, Inc. f/k/a/
Tempo Technology Corporation a/f/k/a Suprahards
Manufacturing Corporation and Suprahards USA Sales
Corporation Plaintiff(s)
v.
CIBC WOOD GUNDY VENTURES, INC., CIBC Wood
Gundy Capital Corp., Placer Dome, Inc., Placer
International Finance, Inc., Sefico Holdings B.V., Tetra
Leval Holdings & Finance S.A., William M. Hayes,
Clifford L. Michel, Ian Austin, Quintin Jackson, Lars
Hallden and John Hamann Defendant(s)
**No. 95-00596, 97-00077.**

Dec. 18, 1998.

Cory E. Friedman , David B. Stratton , David M. Fournier
for Plaintiffs
Allen M. Terrell, Jr. , Thomas L. Ambro , Jesse A.
Finkelstein , Daniel J. DeFranceschi , Catherine G. Wagner
for Defendants Placer Dome, Inc., Placer International
Finance, Inc., William M. Hayes, Clifford L. Michel, and
Ian Austin
Francis A. Monaco, Jr. , Joseph J. Bodnar , and Richard I.
Janvey for Defendant John Hamann
David Posner , Eric A. Rosen for Defendants Sefico
Holdings B.V., Tetra Leval Holdings & Finance S.A.,
Quintin Jackson and the Estate of Lars Hallden
Teresa K.D. Currier , Michael P. Richman , Steven
Wolowitz for Defendants CIBC Wood Gundy Ventures,
Inc., and CIBC Wood Gundy Capital Corp.
Laura Davis Jones , John H. Drucker , and Laurence May
for Debtor

TABLE
OF
CONTENTS
I. Introduction

II History
IIIU.S.
Bankruptcy
Court's
Sale
Hearing
of
June
13,
1995
IVAppeal
to
the
District
Court
V. Appeal
to
the
Court
of
Appeals
for
the
Third
Circuit
VIHearing
on
the
Emergency
Motion
of
the
Official
Committee
of
Unsecured
Creditors
for
Leave
to
Assert
Causes
of
Action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in B.R.                                                                           Page 2
Not Reported in B.R., 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

on
Behalf
of
Creditors
and
Debtor's
Estate
VII Issues
in
the
Pending
Complaint
Related
to:
  A The
    Sale
    Order
    1 The
      Good
      Faith
      Purchaser
      Requirement
    2 Lock-up
      Agreements
      and
      Bid
      Chilling
    3 Employment
      of
      Mr.
      Hamann
      by
      CIBC
      After
      the
      Sale
      Claim
    4 Valuation:
      Whether
      Sale
      of
      Assets
      was
      "For

      Value"
    5 Liquidati
      Value
  B Accounts
    Receivable
  C Fair
    Value
  D Market
    Value
    v
    Liquidatior
    Value
  E Considerati
  F The
    Need
    for
    a
    Stay
    Pending
    Appeal
  G Rule
    60(b):
    Fraud/Frau
    on
    the
    Court
VIII Motions
  to
  Dismiss
  A Fraud
    and
    "New"
    Evidence
  B Res
    Judicata
    and/or
    Collateral
    Estoppel
  C The
    Committee's
    Right
    to
    be
    Heard

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

D Failure
of
Purchaser
to
Fulfill
Payment
Obligations
IX Summary

MEMORANDUM OPINION FN1

FN1. This Memorandum Opinion constitutes our findings of fact and conclusions of law. An initial challenge to the court's jurisdiction is moot inasmuch as it was based on the fact that the sale order was on appeal to the court of appeals at the time the Complaint was filed. The court of appeals has since rendered its decision affirming the district court which affirmed the bankruptcy court

FITZGERALD , Bankruptcy J

I. INTRODUCTION

*1 Before the court are requests to dismiss the Complaint filed by all Defendants, eight of which filed motions to dismiss and four of which filed answers. Defendants Hayes, Michel, Austin, Placer Dome, Placer International, CIBC Wood Gundy, CIBC Capital Corp , and Hamann filed motions to dismiss. Hamann also filed an answer to the Complaint as did Sefico Holdings, Tetra Laval, Jackson, and Hallden's estate. FN2 The answers also request dismissal. The Complaint was filed as a result of the May 16, 1997, approval by the bankruptcy court of the official unsecured creditors' committee's emergency motion for leave to assert causes of action on behalf of creditors and Debtor's estate. For purposes of a motion to dismiss, the court must accept as true all allegations in the Complaint and draw all reasonable inferences in favor of the Committee as the nonmoving party. *Blaw Knox Retirement Income Plan v. White Consolidated Industries, Inc., 998 F.2d 1185, 1188 (3d Cir.1993), cert denied, White Consol. Industries, Inc. v. Pension Ben. Guar. Corp., 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994)* ; *Ferry v. Mutual Life Ins. Co. of N.Y., 868 F.Supp. 764 (W.D.Pa.1994)* If the

Committee failed to state a claim upon which relief may be granted, then the motions to dismiss will be granted pursuant to Fed.R.Civ.P. 12(b)(6) made applicable to bankruptcy cases by Fed.R.Bankr.P. 7012(b). FN3

FN2. Lars Hallden, and not his estate, is named in the Complaint No one has objected.

FN3. Defendants' motions to dismiss are based on Fed.R.Bankr.P. 7012(b) and 7009(b) and Fed.R.Civ.P. 12(b)(1), (6), and (7)

II HISTORY

Tempo Technology Corporation ("Debtor"), a Delaware corporation, was incorporated in 1986 and engaged in the business of manufacturing industrial diamonds and other products for industrial drilling, saw blades, cutting tools, drilling bits, and other related products. Research and development on proprietary processes related to those products were also conducted

Debtor's Board of Directors ("the Board") was composed of seven persons. Tempo CL Corp, which originated Debtor's technology, nominated two members. Sefico Holdings B V ("Sefico"), and its affiliate, Tetra Leval Holdings & Finance S A ("Tetra"), provided primary equity financing and nominated two members collectively Placer Dome also provided primary equity financing and nominated two members. The seventh seat was nominated by certain other shareholders

In the fall of 1994, Debtor sought additional financing in order to commercialize its products. CIBC Wood Gundy Ventures, Inc ("CIBC") FN4 notified the Board on August 12, 1994, that it was interested in investing in Debtor Debtor subsequently granted CIBC full access to all financial and operations information of Debtor pursuant to a confidentiality agreement dated September 13, 1994

FN4. In their brief, the CIBC defendants note that the Complaint does not make specific allegations against (CIBC) Capital Corp or (CIBC) Wood Gundy Ventures. Further, they point out that CIBC, not Capital Corp , was a party to the Asset Purchase Agreement and the commitment letter

Westlaw.

Not Reported in B R
Not Reported in B R , 1998 WL 887256
(Cite as: Not Reported in B.R.)

Page 4

The CIBC defendants seek to have the Complaint dismissed against at least Capital Corp. Memorandum of Law of Defendants CIBC Wood Gundy Ventures, Inc , and CIBC Wood Gundy Capital Corp , etc , in Support of their Motion to Dismiss the Complaint Under Bankruptcy Rules 7012(b) and 7009(b) at 7, n 10  At the hearing on the motion for leave to assert the causes of action which are the subject of this Complaint and the Motions to Dismiss, references were to CIBC Wood Gundy Ventures, Inc "and any affiliates" Transcript of Hearing on Emergency Motion of the Official Committee of Unsecured Creditors for Leave to Assert Causes of Action on behalf of creditors and the Debtor's Estate, May 16, 1994, at 29  Inasmuch as the motions to dismiss are granted, we need not reach the issue of whether Capital Corp  was properly named as a defendant

CIBC conducted extensive due diligence pursuant to the agreement and presented an initial draft sheet calculating an investment of approximately $18 million, primarily in subordinated debentures  CIBC was to invest $6 million of its own money  CIBC notified Debtor, in a letter dated October 27, 1994, that it had hired a firm to conduct further due diligence regarding the proposed $18 million investment  The draft proposal required new management that was satisfactory to CIBC  Debtor therefore engaged an executive search firm to find new management  John Hamann was selected and appointed President of Debtor by the Board on November 9, 1994

*2 Debtor was in need of cash prior to the closing of CIBC financing in order to continue operations  In a letter dated October 24, 1994, Placer Dome proposed to provide $2 million of secured financing as a bridge loan and the proposal was accepted by the Board

By December of 1994, Debtor was in a perilous cash situation and several loan payments were not made  Without the CIBC investment, Debtor's forecast figures for 1995 predicted a net loss of $276,000  With the proposed $18 million investment by CIBC, Debtor's estimated net income forecasts were $2,747,000 in 1996, $9,693,000 in 1997, and $25,466,000 in 1998  Debtor's ability to be a profitable

going concern was dependent upon improved production yields, increased sales volume, and long-term financing  The $18 million was essential to Debtor's continuing operations

On January 10, 1995, CIBC submitted a revised draft sheet which decreased the investment proposal to $14 million in convertible loans  This proposal also required the Board to include Mr Hamann as a member, and the Board accepted the terms of this draft sheet two days later  On January 31, 1995, Debtor entered into a Commitment Letter with CIBC, that contemplated a closing by March 31, 1995  The letter included a clause which stated:

As long as this letter agreement is in effect, neither the Company nor any of its shareholders, directors, officers, employees, agents or representatives (collectively, the "Company Parties") will, without CIBC WGV's prior written approval, (a) solicit, initiate, encourage or discuss any proposal or offer from any person other than [CIBC] relating to an equity financing of the Company (other than communications necessary to advise persons of the Company's lack of interest in any such proposal), or (b) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any person to do or seek the foregoing.

Adv  No  97-00077, Affidavit of Clifford L  Michel, Docket No  18, at Exhibit E

The Complaint alleges that on February 3, 1995, the Chairman of the Board, Clifford L  Michel, issued a memo to the shareholders which stated that "[t]he ability of [Debtor] to operate after March 31, 1995, is dependent upon its ability to obtain additional financing from CIBC or other sources and there can be no assurance that the proposed financing arrangement currently being negotiated with CIBC will be consummated "  Complaint at ¶ 34  Notwithstanding this representation to the shareholders, the Complaint further alleges that, at the Board of Directors' February 3, 1995, meeting, Michel, as Chairman and Secretary of the meeting, recorded that Mr Hamann had been advised by CIBC that CIBC was confident that financing would be completed on a timely basis  Complaint at ¶ 35

On February 15, 1995, Mr  Hamann reported to CIBC and

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 1998 WL 887256
(Cite as: Not Reported in B.R.)

Page 5

the Board that the revised income statement showed an increase in the forecasted loss from $276,000 to $1.4 million. Mr. Hamann testified at the sale hearing that, in March, the Board realized that the operational objectives probably would not be met and so Debtor sought financing. *June 13, 1995, Sale Hearing Transcript* at 43-44. Debtor's March 7, 1995, cash flow report depicted Debtor running out of cash by the end of April 1995 if no investment was received.

**\*3** CIBC's investment closing did not occur at the end of March. On April 6, 1995, CIBC proposed to increase the investment to $16 million. Mr. Hamann continued to warn the Board that cash would not hold out beyond the end of the month. CIBC was asking for additional information and Mr. Hamann notified CIBC at the end of April 1995 that forecasted losses were increased from $100,000 to $3 million due to contamination problems, revised budgeting and a customer's manufacturing problems.

On May 1, 1995, CIBC proposed to purchase Debtor's assets in return for a $5 million first priority convertible loan. The Board did not accept this proposal. At its May 4, 1995, Board meeting, the Board recognized that cash was not sufficient to meet obligations beginning the week of May 15 and that further discussions with CIBC as to its investment proposal would be unproductive. Finally, on May 12, 1995, CIBC made a new purchase proposal which involved a chapter 11 bankruptcy filing.

On May 23, 1995, Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. Debtor also filed a motion to sell substantially all of its assets to Tempo Acquisition Corporation ("TAC") under [§ 363 of the Bankruptcy Code](#) pursuant to the Asset Purchase Agreement. TAC, which was incorporated on May 18, 1995, is owned by CIBC and Clairvest, Inc. The bankruptcy court scheduled an auction of the assets and a hearing to consider the sale motion. Debtor's sale motion required potential bidders to submit their bids and a $1.4 million deposit. The Order approved by Judge Balick also required that on or before May 24, 1995, notice be given via express mail or other next day notice to Debtor's twenty largest unsecured creditors, secured creditors, the United States Trustee, all entities who filed notices of appearance and

requests for notices, and all parties to executory contracts or unexpired leases. Additionally, all other known creditors and Debtor's shareholders were to be served on or before May 25, 1995, by regular first class mail. A notice of the sale was also required to be published in *The Wall Street Journal* not less than ten days prior to the sale. Order of May 23, 1995, Docket No. 13A, at 8.

An auction was held the morning of June 13, 1995, and continued on June 14, 1995. [FN5](#) No bidders appeared at the auction. Diamond Abrasive Corporation ("DAC"), an unsecured creditor who opposed the sale, appeared at the auction but did not bid. DAC's opposition to the sale was founded upon the speed with which the sale came before the court. DAC contended that the sale should be stayed pending the creation of an official unsecured creditors' committee ("committee"). DAC alleged that the sale requirements precluded alternative bidders because the $1.4 million cash deposit was onerous, the assets were being sold "for a song," and the auction was to be held prior to a determination that the sale was better than general liquidation or any alternative proposal. *Objection of Diamond Abrasives Corporation to the Proposed Asset Purchase Agreement.* Bankr No. 95-00596, Docket No. 35, at 3-4 (*see* Exhibit 1 to Appendix to the Memorandum of law in Support of Defendants Placer Dome, Inc. and Placer International Finance, Inc.'s Motion to Dismiss, Adv 97-00077, Docket No. 16)

> FN5. All references to the sale hearing will be to June 13, 1995.

### III. U.S. BANKRUPTCY COURT'S SALE HEARING OF JUNE 13, 1995

**\*4** The hearing on the objections to the sale was held the afternoon of June 13, 1995. [FN6](#) In confirming the sale to TAC, Judge Balick applied the standards of *In re Abbotts Dairies of Pennsylvania, Inc.,* [788 F.2d 143 (3rd Cir.1986)](#), specifically the requirements of adequate notice, a fair and reasonable price, and good faith negotiations. *June 13, 1995, Sale Hearing Transcript* at 167-68.

> FN6. Four unsecured creditors filed objections to the sale: DAC, Fansteel, Inc., Sandvik Hard Metals

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in B.R.                                                                            Page 6
Not Reported in B.R., 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

Company, and Carbidie Corporation. At the sale hearing, only DAC opposed the sale, for the objections of the other three were settled by that time. No other creditors opposed the sale, although all had what the court found to be "good, sufficient, accurate and reasonable notice of the Motion and the relief stated therein, of the hearing scheduled thereon of the sale, and of the opportunity to hold an auction prior to the sale." *Order of June 14, 1995, Approving Asset Purchase Agreement and Granting Related Relief* at 5.

The first issue addressed was whether there was adequate notice. On the bankruptcy filing date (three weeks before the sale), copies of the sale motion were sent to 31 of Debtor's largest unsecured creditors via express mail. *Id* at 168. In addition, notices were sent to approximately 900 entities and published in the national edition of the *Wall Street Journal. Id.* Notice was given as to (1) the relief sought, including the sale of Debtor's assets and assumption of executory contracts and unexpired leases; (2) the time, date, and location for the auction; (3) the deadline for filing objections to the sale; and (4) the opportunity to obtain copies of the motion, proposed final order, and terms and conditions of the sale. *Id* at 12.

The record established that approximately fifteen or sixteen entities requested information from Debtor, and that information was promptly provided. *Id* at 13. Four entities sent representatives to view Debtor's operations and obtain information. *Id* at 13, 168. Two of these entities were major competitors of Debtor, one was a private investor, and one was a venture capitalist. *Id* at 168. Twenty days passed between notice and the auction. *Id* Counsel for Debtor represented at the sale hearing that Board members actively solicited higher and better offers and contacted entities who might have had an interest. *Id* at 14. The court pointed to the inquiries from the four entities and concluded that the notice of sale was adequate. She also took judicial notice of testimony at a prior hearing that Debtor sought investors before filing the chapter 11. *Id* at 168.

The second requirement of *Abbotts Dairies* examined by the court was whether the price was fair and reasonable. CIBC, an owner of TAC (the purchaser), had initially been

interested in investing in Debtor an amount substantially more than that offered for Debtor's assets at the sale. *Id* at 169. However, the investment proposal of approximately $18 million, reduced to $14 million then increased to $16 million, envisioned an expansion of the business and investment of at least $9 million in additional equipment. *Id.* This investment proposition was abandoned by TAC as Debtor did not meet operational specifications set forth by TAC. *Id* at 43 (testimony of John Hamann). TAC subsequently offered to purchase Debtor for approximately $3 million in the form of $150,000 in cash, preferred and common stock of TAC, an assumption of liabilities of an estimated value of over $2 million, FN7 and an equity investment of $1.5 million. *Id* at 8-9, 169. Expansion of Debtor's operations was no longer intended, and the sale would lead to a "slightly reduced work force and other savings." *Id* at 169. Judge Balick found that although TAC originally had been interested in investing in Debtor a significantly higher sum than was ultimately paid for Debtor's assets, the sale price was based upon cost cutting and a reduced equity investment. Thus, she concluded that, even though the $3 million sale offer was significantly lower than the previous $14 million investment proposal, it was fair and reasonable. *Id* at 169-70.

> FN7. The postpetition administrative costs were assumed as well as pre-and postpetition claims of Debtor's employees who would continue employment with TAC. These liabilities were estimated to be in excess of a half million dollars. *See June 13, 1995, Sale Hearing Transcript* at 9 (statement of Attorney Drucker), and 55 (testimony of Mr. Hamann). In addition, TAC assumed a $1.5 million debtor-in-possession financing obligation. *Id* at 55.

**\*5** The final analysis involved the good faith requirement. Judge Balick noted that negotiations were "spirited with some anger and continued for a period of time." *Id* at 169. Additionally, TAC is composed of venture capital companies which are not affiliated with Debtor's management nor its board of directors. *Id* at 169-70. The court found that Mr. Hamann, who was president of Debtor, was interested in staying with the facility's operations, but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in B R                                                                                    Page 7
Not Reported in B R , 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

no employment offer had been forthcoming from TAC prior to the sale completion. *Id* at 170. The bankruptcy court found that the standard set forth in *Abbotts Dairies* had been met and approved the sale of Debtor's assets to TAC. *Id*

Upon court approval of the sale, DAC orally requested a stay pending appeal. *Id* at 176. Judge Balick instructed DAC's counsel to "file the appropriate papers" and stated that she would schedule it. *Id* DAC failed to file that motion, and the transaction closed an hour after the sale hearing concluded

### IV. APPEAL TO THE DISTRICT COURT

The Committee was formed on June 20, 1995, one week after the sale, and joined DAC in appealing the sale order. On appeal to the district court, DAC and the Committee argued that TAC was not a good faith purchaser in the "manner in which [the Debtor] and TAC closed the Asset Sale" *In re Tempo Technology Corp., 202 B.R. 363, 367 (D.Del.1996)*. DAC pointed to the depreciation of Debtor's assets due to CIBC's "dragging its feet" in the investment procedure, the chill of any bidding at the auction (by way of the $1 4 million deposit requirement), Debtor's alleged refusal to provide information to prospective bidders, and the lockup of assets per the January 31, 1995, agreement. *Id. at 367, 370.* DAC also alleged collusion between TAC and Mr Hamann as TAC was able to buy for "totally inadequate consideration" and the favorable employment opportunity offered Mr. Hamann with TAC upon the sale closing. *Id. at 367.*

Although the district court held that the appeal was moot, for a written request for a stay pending appeal was not filed, the court noted, in dictum, that the bankruptcy court applied the proper good faith standard and affirmed the holding of the bankruptcy court that Debtor consummated the sale in good faith. *Id. at 370.* The district court held that "there was no evidence of fraud, collusion, or interested dealing between the players." *Id*

The district court found that although Mr Hamann was hired as the top executive at TAC, Mr. Hamann had not been promised an employment contract prior to the sale and there was no inducement for him to support the Asset

Purchase Agreement. *Id* at 368. The court noted that the purchase negotiations between Debtor and TAC had been debated at arms length, *id* at 370, and that "there was no evidence that TAC colluded with Debtor to attempt to take unfair advantage of other prospective bidders." *Id* Evidence established attempts to solicit bids and Debtor's emergency cash flow need in the Spring of 1995 justified the speedy approval of the sale by the bankruptcy court. *Id* "The entire bankruptcy record supports the bankruptcy court's finding that TAC was a good faith purchaser." *Id*

### V. APPEAL TO THE COURT OF APPEALS FOR THE THIRD CIRCUIT

**\*6** The Court of Appeals for the Third Circuit affirmed the district court's dismissal of the appeal as moot. Counsel for DAC had orally requested a stay pending appeal, but never filed a written motion as instructed by the judge. *In re Temtechco. No. 96-7520, at 6 (3rd Cir. January 22, 1998) (unpublished)*. The court of appeals held that DAC "could have easily anticipated the bankruptcy court's approval of the sale and prepared accordingly." *Id* The court was not persuaded by the argument that the sale was not in good faith because of the speed with which Debtor and TAC consummated the sale and the low sale price. *Id* " 'Lawyers are not strangers to emergency motions" ' and " 'it is not unreasonable to expect practitioners to be prepared to request a stay in short order when a client wishes to appeal from a bankruptcy court's approval of a sale.' " *Id* at 6, *quoting In re CGI Industries, Inc., 27 F.3d 296, 300 n. 8 (7th Cir.1994)*

Although the court of appeals affirmed the district court's dismissal of the appeal as moot, the court addressed the issue of good faith in dictum. DAC and the Committee specifically argued that "TAC paid so little for the assets that it cannot be considered a good faith purchaser." *Id* at 5. The court looked to the fact findings of the bankruptcy court and determined that "the argument attacking the adequacy of the agreed price fails because it does not controvert the ample evidence that TAC acted in good faith." *Id* at 6. The $3 million value of the cash, preferred and common stock in TAC, the assumption of certain liabilities and an equity investment, the spirited negotiations and the lack of affiliation between TAC and the management and Board of

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works

Westlaw.

Not Reported in B.R.                                                                                     Page 8
Not Reported in B.R., 1998 WL 887256
(Cite as: Not Reported in B.R.)

Debtor were evidence of the good faith nature of the sale. *Id.* at 5. Furthermore, the appellate court ruled that the non-existence of the Committee at the time of the sale did not justify the failure to obtain the stay, for all principals of the Committee, including DAC, had notice of the proposed sale. The court of appeals specifically noted that all Committee principals had notice of the proposed sale, and that DAC and the Committee had the same counsel and identical interests. The formation of the Committee after the sale was accorded no weight by the court of appeals and did not justify the failure to obtain a stay. The court of appeals also noted that "DAC clearly evinced a desire to seek a stay ... counsel could have sought the stay purely in its protection of DAC's interests. Therefore, the formation of the Committee after the fact does not justify the failure to obtain (or even seek) a stay." *Id.* at 7.

In *Pittsburgh Food & Beverage, Inc. v. Ranallo,* 112 F.3d 645 (3d Cir.1997), the court noted that failure to obtain a stay pending appeal of a sale renders the appeal moot because the court cannot grant effective relief once the sale is completed. Section 363(m) provides that, unless a stay pending appeal is granted, a reversal or modification on appeal of an order confirming the sale does not affect the validity of the sale. FN8 In *Pittsburgh Food & Beverage* the motion for a stay pending appeal was denied by the bankruptcy and district courts. The trustee and the purchaser consummated the sale while the appeal was pending.

> FN8. *See also In re Egbert Development, LLC,* 219 B.R. 903 (10th Cir.BAP1998) (appeal is moot when stay of an order lifting automatic stay was not sought prior to foreclosure sale). Encouragement of finality of the bankruptcy court's judgments under § 363(b)(1) is promoted by requiring a stay pending appeal. *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147 (3d Cir.1986). Section 363(m) "places prospective appellants on notice of the need to obtain a stay pending appeal, or face dismissal for mootness ... should the district court affirm the bankruptcy court's finding of good faith." *Id.* at 150.

*7 In the matter before us, DAC seeks to set aside the sale based on "fraud, misrepresentation and other misconduct"

of the Defendants. Complaint at ¶ 81. Based on *Pittsburgh Food & Beverage,* the relief sought cannot be achieved. The sale has been consummated and cannot be set aside. Moreover, we are bound by findings of the district court, affirmed on appeal, under the "law of the case" doctrine, inasmuch as that court addressed all the issues raised here with respect to the validity of the sale. *See In re City of Philadelphia Litigation (Africa v. City of Philadelphia),* 158 F.3d 711, 781, *aff'd* 158 F.3d 723 (3d Cir.1998). FN9

> FN9. The law of the case doctrine governs a court's exercise of discretion. Thus, in extraordinary circumstances, a court can reconsider a prior decision. However, we cannot reconsider the decision of the district court or the court of appeals. Further, the extraordinary circumstances required do not exist here. That is, there is no new evidence despite the Committee's assertions, no supervening new law exists, and the earlier decision is not "clearly erroneous" so as to "create manifest injustice." *In re City of Philadelphia Litigation (Africa v. City of Philadelphia),* 158 F.3d at 781. *See also v. Navarro,* 887 F.2d 553, 556 (5th Cir.1989), *rehearing denied* 894 F.2d 99 (5th Cir.1990) (court may not consider matters decided by necessary implication absent presentation of substantially different evidence, intervening change in law, or prior decision that is clearly erroneous and would work a manifest injustice).

## VI. HEARING ON THE EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR LEAVE TO ASSERT CAUSES OF ACTION ON BEHALF OF CREDITORS AND DEBTOR'S ESTATE

The Committee filed a motion on May 14, 1997, in the bankruptcy court seeking authority to assert causes of action on behalf of the creditors and Debtor's estate. A hearing on the Committee's motion was conducted on May 16, 1997. At that hearing, Mr. Friedman, counsel for the Committee, stated that new information had been given to the Committee from Mr. Henry, a former founder and board member of Debtor during an interview with him in New York on May 2, 1997. FN10 *Transcript of Hearing on*

Westlaw.

Not Reported in B.R.                                                                 Page 9
Not Reported in B.R., 1998 WL 887256
(Cite as: Not Reported in B.R.)

*Emergency Motion of the Official Committee of Unsecured Creditors for Leave to Assert Causes of Action on behalf of creditors and the Debtor's Estate (hereafter "Emergency Motion for Leave")*, May 16, 1997, at 15, 29. The court authorized the Committee to file the instant adversary action.

> FN10. For about a year after the June 1995 sale hearing, the Committee received documents through Rule 2004 procedures and through interviews of Mr. Henry. Through this process, the Committee came to the conclusion that Debtor's estate had causes of action against CIBC, Mr. Hamann, and others. *May 16, 1997, Transcript* at 16.

The Committee's Complaint alleges, *inter alia*, that CIBC used the exclusive lock-up agreement and intentionally delayed financing until Debtor ran out of cash. FN11 CIBC and Mr. Hamann were accused of fraud by colluding to falsely represent that Mr. Hamann was working for Debtor when in fact he was furthering the plans of CIBC. Although the Complaint does not cite Rule 60(b) as a basis for this action, at the hearing on the emergency motion for leave to file this adversary Mr. Friedman referred to that portion of Rule 60(b), made applicable to bankruptcy cases by Fed.R.Bankr.P. 9024, which provides that the court may "entertain an independent action to relieve a party from a judgment, order, or proceeding . . ." *See Transcript of Emergency Motion for Leave*, May 16, 1997, at 46. Thus he made it clear at the hearing that Rule 60(b) was the foundation of this adversary.

> FN11. DAC seeks to set aside the sale based on various theories. *See infra*. All counts revolve around the allegations that CIBC delayed financing until Debtor ran out of cash, refused to permit Debtor to seek alternate financing while refusing to supply financing, and rejected Debtor's proposals providing for infusions of cash.

As a result of the hearing, Judge Balick found that Debtor's estate could not or would not bring this action and had, in fact, conceded that the action was colorable. *Transcript of Emergency Motion for Leave*, May 16, 1997, at 96. Judge

Balick also found that there was potential for a considerable benefit to the estate in the event that the Committee was successful and that there was the possibility of success on more than one cause of action. *Id.* at 97. *See In re STN Enterprises*, 779 F.2d 901, 905 (2nd Cir.1985) (if colorable claim for relief is presented, the court, in determining whether debtor unjustifiably failed to bring suit, must also inquire whether an action asserting the claim is likely to benefit the estate before authorizing committee to bring suit). The court found that if the actions were not brought, there would be little benefit to anyone except those who had earned fees in this case. The order permitted the Committee to "determine the appropriate [action] sounding in breach of contract, lender liability, fraud, breach of fiduciary duty, subordination, and piercing the corporate veil." *Order of May 16, 1997*, Bankr. No. 95-00596, Docket No. 208, at 2. However, Judge Balick specifically noted that she was not deciding the merits of the case. *Transcript of Emergency Motion for Leave Hearing*, May 16, 1997, at 97. The Complaint raises theories of "fraud, misrepresentation and other misconduct" of Defendants. *See* Complaint at ¶ 81 (Ninth Claim). *See also* ¶ 61 (Second Claim). The First and Third Claims for Relief seek damages for "Breach of Contract (Lender Liability)" against the CIBC defendants (First Claim) and Placer Dome and Sefico (Third Claim). FN12 The Committee alleges grounds for piercing the corporate veil (Fifth Claim), for subordination of claims (Sixth Claim), and for recovery of preferential transfers (Seventh and Eighth Claims). It also asserts a claim for breach of fiduciary duty (Fourth Claim) against Hayes, Michel, Austin, Jackson, Hallden, Hamann, Placer Dome, Tetra Laval, and Sefico Holdings.

> FN12. The First Claim asserts breach of the covenant of good faith and fair dealing by use of an exclusive lock-up and information gained as a result of a confidentiality agreement to delay completion of financing until Debtor was out of cash. The Third Claim asserts breach of the covenant of good faith and fair dealing by refusing to advance funds "without giving the Debtor any reasonable opportunity to find alternative financing and by publicly announcing their refusal to make additional allowances." Complaint at ¶ 64.

Westlaw.

VII. ISSUES IN THE PENDING COMPLAINT RELATED TO:

(A) The Sale Order

**\*8** As will be seen, the Complaint attempts to revisit issues determined against the plaintiffs in the bankruptcy, district and circuit courts. The Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(m) guides opposition to final judgment of a sale order:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, *unless such authorization and such sale or lease were stayed pending appeal.*

11 U.S.C. § 363(m) (emphasis added).

The emphasized provision furthers the salutary " 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely" ' *In re Vetter Corp.*, 724 F.2d 52, 55 (7th Cir.1983) *quoting* 14 Collier on Bankruptcy ¶ 11-62.03 (14th ed 1977). *See also In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147 (3rd Cir.1986).

1. The Good Faith Purchaser Requirement

When a bankruptcy court authorizes a sale of assets pursuant to § 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser. *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d at 150. Judge Balick stated that "counsel have made innuendo and outright accusations from which the Court could speculate as to the motivations of all interested parties." *June 13, 1995, Sale Hearing Transcript* at 167. However, there was a lack of evidence to support DAC's position and the court was "constrained from speculating," *id.*, finding that TAC was a good faith purchaser. *Id.* at 167-70. Judge Balick found that the standards of *Abbotts Dairies* had been met and approved

the sale. *Id.* at 170. Upon review, the district court and the court of appeals affirmed the good faith determination and held that the appeals were moot because no effective relief could be fashioned in light of the absence of a stay pending appeal. The Complaint adds nothing to the previously decided fact that TAC acted in good faith.

2. Lock-Up Agreements and Bid Chilling

The Committee complains of two lock-up agreements between Debtor and CIBC. The first was entered into on January 31, 1995. This provided in part that Debtor could not, without CIBC's prior written approval,

solicit, initiate, encourage or discuss any proposal or offer from any person other than CIBC WGV relating to an equity financing ... or ... furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any person to do or seek the foregoing.

**\*9** Complaint ¶ 33, and Exhibit E to Affidavit of Clifford L. Michel, Adv. No. 97-00077, Docket No. 18. At the June 13, 1995, sale hearing, Mr. Hamann testified that before and after negotiations with CIBC ceased, efforts were made to solicit other investors for acquisition or financing in March of 1995. *June 13, 1995, Sale Hearing Transcript* at 44. Mr. Hamann testified that four or five venture capital firms were approached, as were private investors and the State of New Jersey. *Id.* With respect to the no-shop clause, Mr. Hamann testified on cross-examination with respect to efforts to solicit higher and better offers. *June 13, 1995, Sale Hearing Transcript* at 132-33.

[O]ne of the things that was vigorously negotiated was an exclusion for directors of the company to shop. I was prohibited from shopping, but directors were not.

*Id.* at 133. He testified that those entities that expressed interest in Debtor's business were in fact contacted by one of the directors. *Id.*

The second lock-up agreement that the Committee alludes to is in the Asset Purchase Agreement, dated May 22, 1995, which provides that "[s]o long as this Agreement has not been terminated ..., without the prior written consent of the Buyer ... [Debtor] shall not ... solicit, initiate or accept any offer or proposal relating to the sale of all or any part of the Purchased Assets and/or the securities" of Debtor,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 1998 WL 887256
(Cite as: Not Reported in B.R.)

and shall not permit . any . entity acting on its behalf to negotiate nor enter into any agreement . with any . entity other than the Buyer . Notwithstanding the foregoing, nothing herein shall preclude (i) [Debtor] from . (B) taking any action in the Chapter 11 Case seeking to sell the Purchased Assets pursuant to the Auction (as defined in Section 10.2(c) below).

*Asset Purchase Agreement.* Draft 5/22/95 at 39, ¶ 10.1. FN13.

> FN13. Paragraph 53 of Committee's Complaint alleges that the May 22, 1995, Asset Purchase Agreement gave CIBC "another" exclusive "lock-up" and prohibited Debtor, and anyone acting on its behalf, from soliciting or accepting any competing offer. Complaint at ¶ 53. Paragraph 54 of the Complaint alleges that Mr. Hamann "did everything possible to chill the bidding by discouraging any possible competing bid" including "refusing to provide adequate information to potential bidders . and [refusing to] allow potential bidders to view the assets they sought to purchase". *Id.* at ¶ 54. The Committee also asserts that the requirement that $1.4 million be deposited before a bidder would be allowed to bid at the sale chilled the bidding. Both of these contentions were addressed at the sale hearing, at which Mr. Friedman argued that "the $1.4 million deposit required for bidding . was predicated on the million dollars' worth of debtor-in-possession financing, where the evidence at trial was that only $500,000 has been advanced. the only logical inference is that the $1.4 million opening price chilled bidding." *June 13, 1995, Sale Hearing Transcript.* at 152-53. With respect to the $1.4 million overbid, the court said:
> DAC contends that the overbid of $1.4 million was a device to intentionally chill bidders, thus the price cannot be fair and reasonable. The financing, which may continue through and is needed to continue operations through June 30 and which is supplied by TAC, does not make the overbid an unreasonable amount.
> *Id.* at 170. That is, in order to offer a higher bid, the

bidder would have to replace the $1 million financing. *June 13, 1995. Sale Hearing Transcript* at 28, statement of Attorney Drucker. The court also ruled against DAC's allegations that the bidding was deliberately chilled and otherwise interfered with. *See June 13, 1995, Sale Hearing Transcript* at 167-70. The court approved the bidding procedures and found that the sale was in good faith. *Id* at 167, 170.

Section 10.2 of the Asset Purchase Agreement details the bidding procedures, including a requirement for notice that competing bids would be entertained. The Asset Purchase Agreement also sets forth qualifications for bidding. The Draft Asset Purchase Agreement was filed and was before the court at the time of the sale. FN14. Thus, all of these issues have been adjudicated previously.

> FN14. *See* the description of the sale hearing in text beginning at page 10.

### 3. Employment of Mr. Hamann by CIBC after the Sale Claim

The Asset Purchase Agreement is fully integrated, as paragraph 12.6 states that
[t]his Agreement and the documents referred to herein contain the entire agreement between the Parties with respect to the sale of the Purchased Assets and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way.
*Asset Purchase Agreement.* Draft 5/22/95, ¶ 12.6. Thus, employment negotiations between TAC and Mr. Hamann prior to the Asset Purchase Agreement would not govern over the terms of the Asset Purchase Agreement unless incorporated therein.

**\*10** Paragraph 55 of the Committee's Complaint states that Mr. Hamann "falsely testified that he had no future expectation of further employment after the sale to CIBC." Complaint ¶ 55. At the sale hearing, Mr. Hamann testified that TAC was in no way obligated to offer employment to Mr. Hamann or other officers or shareholders of Debtor, there were no additional promises, coercion or bribes in

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 1998 WL 887256
(Cite as: Not Reported in B.R.)

Page 12

connection with the execution of the asset purchase agreement. *June 13, 1995, Sale Hearing Transcript* at 64-65. Mr. Hamann admitted that he hoped that he would be considered for future employment, however. *Id.* at 65.

The motion for approval of the Asset Purchase Agreement specifically states that "Article 5 of the Asset Purchase Agreement provides for a number of conditions to closing including that TAC will have entered into employment or other agreements with ... John R. Hamann, President" as well as other employees. *Motion for Orders*, Bankr. No 95-00596, Docket No. 13, at 17-18, ¶ 24. TAC also agreed to pay any amounts to Mr. Hamann that had been guaranteed by "Placer" FN15 to Mr. Hamann as compensation. *Id.* Moreover, the Asset Purchase Agreement states, as one of the conditions of closing, that "[t]he Seller shall have entered into agreements with the employees listed on the *Employees Schedule* attached hereto in form and substance substantially similar to those agreements involving non-competition and confidentiality to which such employees are currently a party and such agreements shall be in full force and effect." *Asset Purchase Agreement* at ¶ 5.1(j). However, the Employees Schedule and nine other schedules specified in the Asset Purchase Agreement are not among documents provided to the undersigned. It does not appear that Judge Balick had a copy of the Employee Schedule as there was only one copy of the Asset Purchase Agreement filed with the court, which was the draft dated May 22, 1995, filed with the bankruptcy petition on May 23, 1995. However, the lack of an Employee Schedule in this adversary is not dispositive. Even if Mr. Hamann was less than candid in his testimony at the sale hearing concerning his prospects for employment, it was clear from the combination of the motion for approval of the Asset Purchase Agreement and from the Agreement itself that the employment of Mr. Hamann was contemplated. Any inconsistency between the provisions of the Asset Purchase Agreement and Mr. Hamann's testimony concerning his future employment with TAC could have been, and were, explored through cross-examination. Mr. Hamann testified that "the only thing that counts are written offers. I don't have any written offer from anybody." *June 13, 1995, Sale Hearing Transcript* at 113. He further testified on cross-examination that his discussions concerning

employment with TAC occurred after the terms of the Asset Purchase Agreement were finalized. *Id.* at 114-15. The Asset Purchase Agreement moreover "contemplate[d] that the majority, if not all, the employees will be part of the new enterprise." *Id.* at 116. Mr. Hamann's testimony was uncontroverted. Nothing new is raised in this Complaint and Mr. Hamann's credibility was subject to review by the bankruptcy court whose findings were upheld on appeal.

> FN15. Placer Dome provided the bridge financing referred to *supra*, at p. 6.

4. Valuation: Whether Sale of Assets was "For Value"

**\*11** An argument raised by DAC at the sale hearing pertained to the valuation of Debtor's assets and whether TAC was paying "value." The value of all Debtor's assets as reflected on the balance sheet of January 1, 1995, which included the value of equipment determined by cost less depreciation, was $18,129,508. *June 13, 1995, Sale Hearing Transcript* at 69, 73. Mr. Hamann testified to a significantly lower liquidation value. *Id.* at 74-75.

5. Liquidation Value

At the sale hearing, Mr. Hamann was questioned as to his experience in the liquidation of corporations, and the evidence established that he had been involved in three turnarounds, one of which was a liquidation of a software company. *June 13, 1995, Sale Hearing Transcript* at 75-76. Mr. Hamann noted that Debtor was the first of its kind of business to file bankruptcy. He testified that, although there was no one in the world who had experience in liquidating abrasives, in his view valuation was similar to liquidation of a software company inasmuch as a willing buyer and willing seller are necessary and a customer who knows that he does not have to pay full price will not do so. *Id.* at 75, 78-79. He described two liquidation evaluations that he conducted with respect to Debtor's business. The first was as of May 12, 1995, and the second was June 12, 1995. As of the date of filing of the chapter 11 on May 23, 1995, he concluded that the likely liquidation value would be $2 million. *Id.* at 51. The plant, property and equipment were worth $1 million as of May 12. *Id.* at 74. Deducting the costs of liquidation, approximately $1.5 million would be

Westlaw.

Not Reported in B.R.                                                                     Page 13
Not Reported in B.R., 1998 WL 887256
(Cite as: Not Reported in B.R.)

available to creditors. *Id.* at 51. Under the first evaluation he concluded that secured creditors would receive $800,000 and unsecured creditors $700,000. A month later he concluded that $780,000 would be available for secured creditors and only $100,000 for unsecured creditors. *Id.* at 52. He further testified that much of Debtor's inventory was designed for specific customers who would not pay full value if the company was liquidating. *Id.* at 75. Thus, the value of Debtor's assets was significantly lower than it would have been if the assets were sold as a going concern. *Id.* at 74-75.

### B. Accounts Receivable

Another issue pertained to the accounts receivable that were estimated at $1,249,360 as of January 1, 1995. *Id.* at 71. Mr. Hamann estimated the face value of the receivables to be approximately $500,000 to $600,000 at the time of the sale. *Id.* at 81. He noted that this figure was a "pure estimate" and that the controller would know the correct answer. *Id.* However, the controller was not called to testify. Mr. Hamann testified that, although Debtor's receivables collection was almost 100 percent, he estimated the liquidation value of the receivables at $350,000 on the theory that customers might elect not to pay anything if Debtor went into liquidation, thereby adding to the difficulty of collection. *Id.* at 82-83. Mr. Hamann said that an experienced sales representative had helped him arrive at the accounts receivable figure. *Id.* This sales representative was not called to testify as to his basis for the receivables estimate. The Committee asserted that after the sale was confirmed, TAC, led by Mr. Hamann, has actually collected nearly $1 million in receivables and that Mr. Hamann's statement of lower valuation and collectibility at the sale hearing was so misleading as to perpetrate a fraud on the court. Although it appears that Mr. Hamann severely underestimated the collectibility of Debtor's receivables, his testimony was not contradicted in any way and no other witnesses were called, despite the fact that an opportunity to do so was provided via discovery and the trial process. Mr. Hamann's undervaluation coupled with the fact that he is now employed by TAC in an executive position is troubling and would raise serious questions about his loyalty to his fiduciary obligations to this estate but for the fact that there

is no evidence of record except his testimony, even though he explained the limitations of his knowledge. Judge Balick, who actually heard the witness, had all this information available to her at the sale hearing, adjudged the testimony to be credible, noted the opportunity to perform discovery that had been afforded, found the sale to be in good faith, and was affirmed on appeal by the district court and the court of appeals. This issue, therefore, is not a proper subject for Rule 60(b).

### C. Fair Value

**\*12** Generally speaking, a purchaser who pays 75 percent of the appraised value of the assets is considered to have tendered value. *See In re Abbots Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149 (3rd Cir.1986). Where the purchaser is found to have acted in good faith, the auction price suffices to demonstrate that the purchaser "paid value" for the assets. *In re Gucci,* 126 F.3d 380, 390 (2nd Cir.1997), citing *In re Colony Hill Associates,* 111 F.3d 269, 276 (2nd Cir.1997). *See also In re Temtechco, Inc.,* No. 96-7520 at 6 ("the argument attacking the adequacy of the agreed price fails because it does not controvert the ample evidence that TAC acted in good faith").

In its opinion in *Temtechco,* the court of appeals further addressed the issue of "fair value" in relation to a "good faith" purchaser. Upon the bankruptcy court's determination that TAC was a good faith purchaser, there was no need for an independent assessment of whether the purchase price was adequate. *See In re Temtechco,* No. 96-7520 at 6. There was ample evidence that the purchaser acted in good faith. *Id.* Thus, the purchase price constitutes value in exchange for the assets.

### D. Market Value v. Liquidation Value

The Supreme Court has adopted Black's Law Dictionary's definition of "market value" and noted that

[t]he market value of ... a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to

Westlaw.

find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular ... piece of property

*BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537-38, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556, *rehearing denied* 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994) (quoting Black's Law Dictionary 971 (6th ed 1990) "[F]air market value" presumes market conditions that, by definition, do not reflect a forced or emergency sale *Id.* at 538, 114 S.Ct. at 1761 Property that *must* be sold within a specified time is simply worth less *Id.* at 539, 114 S.Ct.. at 1762 FN16

> FN16. In *BFP v. Resolution Trust Corp .* a chapter 11 debtor brought fraudulent transfer proceedings to avoid a mortgage foreclosure sale The debtor claimed that the price received at the sale was less than the "reasonably equivalent value" of the property The court held that the "reasonably equivalent value" is the price received at the forced sale as long as the requirements of the state's foreclosure law were met *Id.* at 545, 114 S.Ct. at 1765 Although the matter before us does not involve a state foreclosure proceeding, the definition of market value applies Here there was an attempt to find buyers but only TAC came forward to bid at the sale hearing

Mr Hamann testified that if the sale was not expedited, the resulting loss of vendor, customer, and employee confidence would erode the value of Debtor's business. *See generally June 13. 1995. Sale Hearing Transcript* at 66-78 Mr Hamann's uncontradicted testimony that the financing Debtor obtained was necessary and that Debtor did not have sufficient cash to continue operations was relied on by the court The reduced sale price was explained to the satisfaction of the bankruptcy court and the findings were affirmed on appeal

E  Consideration

Mr Hamann testified that under the Asset Purchase Agreement, the consideration paid was $150,000 in cash, the assumption of the million dollar debtor-in-possession financing obligation by the new company, the assumption of approximately $500,000 in obligations related to employee vacation and sick pay; $3 million in preferred stock in the new company, payable at 18, 30, and 42 months in $1 million increments, ten percent equity in the new company, and a million and a half dollars financing commitment to capitalize the company *Id* at 55 Mr Hamann testified that there was "considerable debate" concerning the relative worth in liquidation vis-a-vis the Asset Purchase Agreement The analysis conducted led him to the conclusion that the Asset Purchase Agreement had a cash value of $3 million The discounted value of the preferred stock was estimated at $2 million and "common equity would be worth another million dollars", based on business projections *Id* at 56

*13 On cross-examination, Mr Hamann testified that in discounting the $3 million in preferred stock, he picked a discount rate of 15 per cent, representing a "compromise between ... prime rate and a venture capital rate " *Id* at 92 This rate was picked as a combination of a discount rate representing the time value of money and the risk of the preferred *Id* at 93 Mr Hamann stated that a venture capital investment conventionally involves a company that has very uncertain prospects for profitability which are generally two to three years out, but that Debtor had a business plan which called for profitability the year of the sale hearing, assuming Debtor obtained financing and continued in operation *Id* at 94-95 Thus the discount rate reflected the nature of the risk FN17

> FN17. On direct examination, Mr Hamman testified that he viewed CIBC and Clairvest, Inc , the participants in TAC, to be merchant bankers and venture capitalists. *Id* at 42

Mr Hamman was further questioned as to whether Debtor's performance was consistent with the business plan at the time of the filing *Id* at 94 Mr Hamann testified that during his tenure with Debtor, the business plan had been met monthly except for May of 1995, inasmuch as the business plan contemplated financing, not bankruptcy *Id* at 94-95 The company's position in May of 1995 was consistent with the amount of cash coming in as supplemented by cash from stockholders, minus expenditures *Id* at 94-95

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works

Westlaw.

Not Reported in B.R.                                                                                      Page 15
Not Reported in B.R., 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

All of the issues relating to value were adjudicated previously.

### F. The Need for a Stay Pending Appeal

The court of appeals gave no weight to the fact that the Committee was not formed until six days after the sale was confirmed and closed. The court of appeals stated that, since DAC "clearly evinced a desire to seek a stay on the day the sale was authorized, counsel should have sought the stay purely in its protection of DAC's interest." *In re Temtechco,* 96-7520, at 7. Thus the district court's dismissal of the appeal as moot was affirmed.

The effect of § 363(m) was explained by the court of appeals subsequently. In *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,* 141 F.3d 490, 499 (3d Cir.1998), the court ruled that not every unstayed sale would be moot on appeal, but the result of a reversal or modification of an order authorizing the sale would be restricted if reversal or modification would affect the validity of the sale. *Id.,* citing *In re Swedeland Development Group, Inc.,* 16 F.3d 552 (3d Cir.1994). The court depicted two prerequisites for § 363(m) "statutory" mootness: (1) the underlying sale was not stayed pending the appeal, and (2) reversal or modification of the order authorizing the sale would affect the validity of the sale. 141 F.3d at 499. The court stated that if there was no grant of a stay pending appeal, then the court must determine whether relief can be implemented in a manner that does not affect the validity of the sale. *Id.* The determination depends on the remedy requested. *Id.* In *Krebs,* the court held that a refund would attack the sale price, which is central to a sale and challenges its validity. Thus relief could not be granted on that basis. *Id.*

**\*14** Although courts are reluctant to set aside sale orders due to the policy of promoting the finality of judicial sales, there are exceptions. In *In re CADA Investments, Inc.,* 664 F.2d 1158 (9th Cir.1981), the court noted a willingness to set aside confirmed sales that were "tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction." 664 F.2d at 1162. *See also In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147-48 (3rd Cir.1986) (citing *In re CADA Investments, Inc.*) "Although the policy of finality normally protects confirmed sales from orders to set aside, sales are properly set aside when compelling equities outweigh the interests in finality." *In re CADA Investments, Inc.,* 664 F.2d at 1162. These considerations are not operative here as the facts, taken in the light most favorable to the Committee as the nonmoving party, do not support their employ. All allegations of fraud, chilled bidding, etc., were raised in the bankruptcy court and on appeal and all were rejected. To the extent the Committee alleges that it interviewed additional witnesses since the sale was confirmed, we note that they had the opportunity to do so through discovery before the sale hearing and failed to take advantage of it.

The Complaint at issue seeks to attack the final sale order, including the finding of good faith and TAC's purchase price. The validity of the sale would be affected as the Committee seeks to set aside the sale order. As previously noted, this sale cannot be "undone" at this late date.

### G. Rule 60(b): Fraud/Fraud on the Court

In addition to enabling the court to "entertain an independent action to relieve a party from a judgment, order, or proceeding" Rule 60(b)'s "savings clause" also permits the court to set aside a judgment for fraud upon the court." Fed.R.Civ.P. 60(b). Fraud on the court reaches matters that "harm [ ] the integrity of the judicial process." *In re Intermagnetics America, Inc.,* 926 F.2d 912, 917 (9th Cir.1991).

Several courts have looked to the definition of "fraud upon the court" provided in *Moore's Federal Practice:*

"Fraud upon the court" should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.33 at 515 (2d ed 1978), *quoted in Alexander v. Robertson,* 882 F.2d 421, 424 (9th Cir.1989) *See also Kupferman v. Consolidated Research & Mfg. Corp.,* 459 F.2d 1072, 1078 (2nd Cir.1972)

"[F]raud upon the court includes both attempts to subvert

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in B R                                             Page 16
Not Reported in B R , 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

the integrity of the court and fraud by an officer of the court " *In re Intermagnetics America, Inc.*, 926 F.2d at 916 Officers of the debtor-in-possession are considered officers of the court *Id.* at 917. They are required to act in the best interests of the estate and have accompanying fiduciary duties *Id* In *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, *rehearing denied* 322 U.S. 772, 64 S.Ct. 1281, 88 L.Ed. 1596 (1944) , the Supreme Court explained that the inquiry as to whether a judgment should be set aside for fraud upon the court under Rule 60(b) focuses not so much in terms of whether the alleged fraud prejudiced the opposing party, but more in terms of whether the alleged fraud harms the integrity of the judicial process:

> **\*15** [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.
> 322 U.S. at 246, 64 S.Ct. at 1001

The standard to prove a Rule 60(b) "fraud on the court" is high, for "[a]n independent action for fraud may not be entertained 'if there was an opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action ' " *M.W. Zack Metal Co. v. Int'l. Navigational Corp. of Monrovia*, 675 F.2d 525, 529 (2d Cir.), *cert denied* 459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 604 (1982) (citation omitted)

> [I]t is well settled that a party seeking relief in an independent action for fraud under Rule 60(b) must establish that [there was] 'no opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action' .. Such an action can not stand if it is merely an attempt to relitigate the case
> *Weldon v. United States*, 845 F.Supp. 72, 80-81 (N.D.N.Y.1994), *aff'd* 70 F.3d 1 (2nd Cir.1995)

In order to obtain relief from a judgment via an independent action on the issue of fraud or fraud on the court these elements must be established:

1) the judgment ought not be enforced in equity and good conscience;

2) a good defense to the cause of action exists;

3) fraud, accident, or mistake prevented the defendant from obtaining the benefit of the defense;

4) no fault or negligence existed on the defendant's part and

5) no adequate remedy exists at law

*Addington v. Farmer's Elevator Mutual Ins. Co.*, 650 F.2d 663, 667-68 (5th Cir.), *cert denied* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981) To sustain a "fraud on the court" claim under Rule 60(b), the order or judgment must be attacked on the basis of matters that were not known, and with diligence could not have been known, at the time the order or judgment was entered *Id* A final judgment should not be set aside on the ground of fraud when the information was available in the first action, in whole or in part. *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir.1985), *cert denied* 474 U.S. 1086, 106 S.Ct. 862, 88 L.Ed.2d 900 (1986) , citing *Wilkin v. Sunbeam Corp.*, 466 F.2d 714 (10th Cir.1972), *cert denied* 409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258 (1973) In addition to the requirements under Rule 60(b), res judicata would also preclude the parties or their privies from relitigating issues that were or could have been raised *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981) In *Addington*, the court held that the allegations did not satisfy the necessary requirements For example, it was alleged that perjured testimony had been adduced The court found that this was an attempt to relitigate the credibility of the witness whose testimony previously had been accepted in the face of a similar claim. In the matter before us nothing new has been raised in the Complaint.

## VIII MOTIONS TO DISMISS

### (A) Fraud and "New" Evidence

**\*16** CIBC's Reply Memorandum of Law in support of its motion to dismiss the Complaint focuses on res judicata and collateral estoppel *Reply Memorandum of Law of Defendants CIBC Wood Gundy Ventures, Inc and CIBC*

© 2005 Thomson/West. No Claim to Orig U S Govt Works

Westlaw.

Not Reported in B R                                                                                                      Page 17
Not Reported in B R , 1998 WL 887256
(Cite as: Not Reported in B.R.)

*Wood Gundy Capital Corp in Further Support of Their Motion to Dismiss the Complaint Under Bankruptcy Rules 7012(b) and 7009(b) (hereafter "CIBC's Reply Memorandum"),* Adv No. 97-00077, Docket No 41 CIBC alleges that the Committee has "recharacterized" the claims under a Rule 60(b) motion and that each issue was or previously could have been adjudicated at the sale hearing *Id* at 7. The Committee argues in its Surreply Memorandum of Law in opposition to CIBC's motion to dismiss that "[w]hile the Committee advanced many of the same arguments in the Third Circuit, they were never reached, because the Third Circuit affirmed the District Court's dismissal of the appeal based upon the absence of a stay." *Plaintiff's Surreply Memorandum of Law in Further Opposition to Defendants' Motion to Dismiss ",* Adv No 97-00077, Docket no 44, at 7 Correspondingly, "[t]he CIBC Defendants ... cannot now claim that they cannot be litigated because the Third Circuit considered them." *Id*

As is evident in the record, throughout the May 16, 1997, hearing and in the resulting Complaint, the allegations of fraud were identical to the objections that were made at the June 13, 1995, sale hearing. They included the alleged collusion between CIBC and Mr. Hamann, bid chilling through the lock-up agreement and discouragement of potential investors, and Mr Hamann's testimony as to future employment with TAC. None of these allegations will support Rule 60(b) relief.

Although the Committee now asserts that it has a witness and/or documents to support the contentions raised at the sale hearing, no new previously undiscoverable evidence is alleged in this adversary. Further, the alleged "new" evidence has never been specifically described, as Mr Friedman referred in court to "documents" and "discussions with Mr Henry" as the basis for his claim of fraud on the court The present Complaint does not mention or describe "new" information in any more detail. Although Mr Henry lives in Australia and Mr Bogard, another board member, lives in Monaco, *id* at 16, Mr Friedman did not argue that this new, unspecified information could not have been obtained from Mr Henry prior to the sale. Mr. Friedman claims that Mr Henry now has stepped forward to supply the information that gives Debtor claims against CIBC and

Mr Hamann. However, there was no attempt at the sale hearing on June 13 and 14 of 1995 to question or produce any other witnesses other than Mr Hamann. There was no attempt to introduce additional documents, despite the fact that the opportunity for pretrial discovery existed *See June 13. 1995. Sale Hearing Transcript* at 97 FN18 Thus, the allegation falls short of the requirements of Rule 60(b) and falls within the doctrine of collateral estoppel Further, issues were raised and tried at the sale hearing and res judicata bars their relitigation. *See Bonin v. Calderon,* 59 F.3d 815 (9th Cir.1995), *cert denied* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671, *rehearing denied* 516 U.S. 1142, 116 S.Ct. 977, 133 L.Ed.2d 897 (1996) "[A] district court does not abuse its discretion in denying a motion to amend where the movant presents no new facts but only new theories and provides no satisfactory explanation for his failure to develop his contentions originally." *Id* at 845 *See also Gekas v. Met-L-Wood Corp.,* 80 B.R. 912, 915-16 (N.D.Ill.1987), *aff'd,* 861 F.2d 1012 (7th Cir.1988), *cert denied* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989)("A statement of 'clear and convincing probative facts' is necessary for a Rule 60(b) motion to be sufficient") Although Mr Friedman alluded to "fraud on the court" at the May 16, 1997, hearing, *Transcript of Emergency Motion for Leave Hearing. May 16. 1997,* at 46, "fraud on the court" and Rule 60(b) were not mentioned in the Complaint "Fraud on the court" can only be brought for issues that were not and could not have been brought in the first instance. Nothing in this action qualifies

> FN18. Apparently the discovery opportunity was not utilized. The court said: "I am aware that there was an opportunity for discovery and that discovery was not forthcoming You've had an opportunity to come back to the Court." *June 13, 1995. Sale Transcript Hearing* at 97

> (B) Res Judicata and/or Collateral Estoppel

*17 Under Federal Rule of Civil Procedure 60(b), a party may be relieved of a final judgment in appropriate cases *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 863, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988). The court may entertain a Rule 60(b) motion without appellate leave and reopen a case which has already been

© 2005 Thomson/West No Claim to Orig U.S Govt Works

Westlaw.

Not Reported in B R
Not Reported in B R , 1998 WL 887256
(Cite as: Not Reported in B.R.)

reviewed upon appeal *Standard Oil Co. of California v. United States,* 429 U.S. 17, 18-19, 97 S.Ct. 31, 32, 50 L.Ed.2d 21 (1976) "Res judicata does not preclude a litigant from making a direct attack [under Rule 60(b) ] upon the judgment before the court which rendered it " *Jordan v. Gilligan,* 500 F.2d 701, 710 (6th Cir.1974), *cert denied* 421 U.S. 991, 95 S.Ct. 1996, 44 L.Ed.2d 481 (1975) *See also Weldon v. United States,* 70 F.3d 1, 5 (2d Cir.1995) ; *Watts v. Pinckney,* 752 F.2d 406, 410 (9th Cir.1985). The doctrine of res judicata, however, bars a collateral attack on a final judgment *Watts v. Pinckney,* 752 F.2d 406, 410 (9th Cir.1985)(emphasis in original) A direct attack is defined as follows:

> A direct attack on a judicial proceeding is an attempt to correct it, or to void it, in some manner provided by law to accomplish that object It is an attack    by appropriate proceedings between the parties to it seeking, for sufficient cause alleged, to have it annulled, reversed, vacated or declared void

*Id* (citation omitted)

In *Weldon I* (*Weldon v. United States,* 744 F.Supp. 408 (N.D.N.Y.1990), *aff'd* 952 F.2d 394 (2d Cir.1991), *cert denied* 504 U.S. 988, 112 S.Ct. 2973, 119 L.Ed.2d 592 (1992)), Weldon brought a personal injury action after becoming ill from the swine flu vaccine The district court granted summary judgment for the government and the court of appeals affirmed. Thereafter, Weldon brought a Rule 60(b) action, *Weldon v. United States,* 845 F.Supp. 72 (N.D.N.Y.1994), *aff'd* 70 F.3d 1 (2d Cir.1995) , (*Weldon II* ) The complaint charged that during the litigation of *Weldon I,* the United States had committed "fraud, misrepresentation, and other misconduct" and "fraud upon the court," for which she was entitled to equitable relief, specifically requesting vacatur of the summary judgment *Weldon II, 70 F.3d at 2* The district court denied the motion On appeal, the court of appeals distinguished between a direct and a collateral attack. Because Weldon had "a full and fair opportunity to litigate her present claims in *Weldon I.*" *id .* the court determined that Weldon was seeking to collaterally attack the judgment which action was impermissible

Here, CIBC alleges that this Complaint is a collateral attack

on the sale order For the reasons previously discussed in this Memorandum Opinion, we agree Thus, the issues cannot be relitigated through Rule 60(b).

(C) The Committee's Right to Be Heard

The Committee seeks relief on the ground that it was not formed at the time of the sale and, therefore, could not participate as a party in interest CIBC objects to the Committee's standing

**\*18** The creditors' committee is a fiduciary for all of the unsecured creditors of the estate *See, e g . In re SPM Manufacturing Corp.,* 984 F.2d 1305, 1315 (1st Cir.1993)(rehearing denied) "Thus the committee's fiduciary duty, as such, runs to the parties or class it represents ... It is charged with pursuing whatever lawful course best serves the interests of the class of creditors represented" *Id See generally* 7 Collier on Bankruptcy ¶ 1103 (15th ed (revised) 1998) A creditors' committee has numerous responsibilities to fulfill its role in a chapter 11 case:

> The creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally. On the contrary, it is purposely intended to represent the necessarily different interests and concerns of the creditors it represents It must necessarily be adversarial in a sense ... There is simply no other entity established by the Code to guard those interests The committee as the sum of its members is not intended to be merely an arbiter but a partisan which will aid, assist, and monitor the debtor pursuant to its own self-interest

*In re SPM Manufacturing Corp.,* 984 F.2d at 1317 The legislative history to § 1103 makes it clear that Congress envisioned that the official committee is intended to be the party that negotiates a chapter 11 plan on behalf of the constituency FN19

> FN19. "[Committees] will be the primary negotiating bodies for the formulation of the plan of reorganization They will represent the various classes of creditors and equity security holders from which they are selected " H R Rep No 595 , 95th Cong 1st Sess 401 (1978), *reprinted in* U S C C A N 5963, 6194, 6357 *See also* Harvey

Westlaw.

Not Reported in B.R.                                                          Page 19
Not Reported in B.R., 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

R. Miller, *The Changing Face of Chapter 11: A Reemergence of the Bankruptcy Judge as Producer, Director, and Sometimes Star of the Reorganization Passion Play,* 69 Am. Bankr.L.J.431, 447-49(1995)

Considerations of due process compel a relatively expansive right to participate in the reorganization proceedings. *See* 7 Collier on Bankruptcy, *supra,* at ¶ 1109.02[2][b]. The court in *In re Boomgarden,* 780 F.2d 657 (7th Cir.1985), noted that "[i]n bankruptcy proceedings, both debtors and creditors have a constitutional right to be heard on their claims, and 'the denial of that right to them [is] the denial of due process which is never harmless error.' " 780 F.2d at 660-61. *See also Turney v. F.D.I.C.,* 18 F.3d 865, 868 (10th Cir.1994) (due process requires notice and an opportunity to be heard at a meaningful time in a meaningful manner); *Republic Nat'l. Bank of Dallas v. Crippen,* 224 F.2d 565, 566 (5th Cir.1955)(the right to be heard is a constitutional right and its denial is denial of due process which is never harmless error). "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly,* 397 U.S. 254, 268-69, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970)

In this case, the sale was expedited due to the exigent circumstances surrounding Debtor and the likely significant decline in value of Debtor's assets absent an immediate sale before the Committee was appointed. The Motion for Orders by which Judge Balick approved the sale depicted that Debtor's assets required continuous maintenance and operation, and that their value would be significantly diminished, if not eliminated, were the equipment not being used. *Motion for Orders* at 13, ¶ 16. Furthermore, the motion alleged that Debtor had to maintain its customer base in order to be productive and profitable, for, if Debtor ceased to operate for even a few days, Debtor would lose essential business and its value would be significantly less. *Id.* at ¶ 17.

**\*19** Although the Committee had not yet been formed, Judge Balick took precautions to ensure that all creditors, which included those who later composed the Committee, were notified and had full opportunity to be heard. *See Order (A) Scheduling Date...and Prescribing...Notice of[*

*] Hearing on...Asset Purchase Agreement* Bankr.No. 95-00596 at Docket No. 13A. The fact that the Committee's appointment by the U.S. Trustee was delayed until after the sale hearing is unfortunate but the fact that Committee members and counsel in this adversary were fully advised of the sale and opposed it until all but DAC's objections were resolved establishes active involvement by creditors prior to the Committee's formation. The Committee, because it was formed after the sale closed, had no opportunity to seek a stay, but the court of appeals has already denied relief on this basis. We cannot grant relief previously denied by an appellate court.

(D) Failure of Purchaser to Fulfill Payment Obligations

In its recitation of facts in the Complaint, the Committee alleges that the purchaser is unable to redeem the preferred stock as it is required to do. Paragraph 57 of the Complaint states that "[o]nce CIBC purchased the Debtor's assets, it made its investment in the new Tempo Technology Corporation as debt, rather than equity, thereby insuring that the new Tempo Technology Corporation is perennially insolvent and, under Delaware law, unable to redeem the preferred stock the Debtor's estate received for the Debtor's assets..." Complaint at ¶ 57. This issue arises from various representations made in conjunction with the sale. FN20. At least one payment was not made but the final payment is not yet due. These facts, if proven, clearly could not have been known at the sale hearing inasmuch as it would be a post-closing default. The Committee does not assert a cause of action on this basis, however, and a complaint on this ground would not be a proper subject for a Rule 60(b) action. Rather, a direct action for this alleged breach of contract may lie. Thus, nothing in this Memorandum Opinion affects any possible cause of action based upon TAC's alleged nonperformance of its contract since the sale closed.

> FN20. In its response to DAC's objection to the sale, Debtor again represented that "the issuance of $3,000,000.00 face amount of TAC's redeemable preferred stock...will be redeemed in payments of $1,000,000.00 each, eighteen months, thirty months and forty two months after closing." *Reply of Tempo Technology Corporation to Objection of*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in B.R.                                                                    Page 20
Not Reported in B.R., 1998 WL 887256
**(Cite as: Not Reported in B.R.)**

*Diamond Abrasive Corporation.* Bankr No        requests to dismiss the above-captioned Complaint are
95-00596, Docket No. 39A, at 9, ¶ 11(c)(emphasis     GRANTED and the Complaint is DISMISSED.
added) At the sale hearing, Mr Hamann, on direct
questioning, stated that the $3 million preferred    It is FURTHER ORDERED that the Clerk shall close this
was "payable at 18, 30, and 42 months at $1         Adversary.
million increments." *June 13. 1995. Sale Hearing
Transcript* at 55 This value was discounted to an    Bkrtcy D Del ,1998
estimated $2 million as the then present value *Id*  In re Temtechco, Inc
at 56. Judge Balick, in approving the sale, found    Not Reported in B R , 1998 WL 887256
that there was adequate notice, good faith
negotiations, and a fair and reasonable price *Id* at   END OF DOCUMENT
167-70

### IX SUMMARY

In this case, the opportunity existed to litigate the claims
raised by the Committee We find that all the allegations
relate to the same course of events leading up to the sale and
were raised at the sale hearing and in the appeals to the
district court and the court of appeals The Committee is
foreclosed from raising these claims in the guise of a Rule
60(b) motion The Committee has alleged "new evidence"
in the form of information from Mr. Henry but the "new
evidence" was never specifically described and everything
alleged in connection with this adversary proceeding was or
could have been available to the Committee's members at
the time of the sale hearing

Therefore, assuming all facts alleged in the Complaint are
true, and construing all reasonable inferences therefrom in
favor of the Committee as the nonmoving party, there is no
foundation under Rule 60(b) to grant the relief requested in
this Complaint inasmuch as all issues were raised and
addressed at the sale hearing and subsequently on appeal
The requests to dismiss the Committee's Rule 60(b)
Complaint will be granted as there is no claim stated upon
which relief may be granted

**\*20** An appropriate order will be entered.

### ORDER

AND NOW, this 18th day of December, 1998, for the
reasons expressed in the foregoing Memorandum Opinion,
it is ORDERED, ADJUDGED, and DECREED that the

© 2005 Thomson/West. No Claim to Orig. U S Govt Works.